UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON
CASE NO. 5:22-cv-231-DCR
*Electronically Filed*

| | |
|---|---|
| **EUGENE BAKER, et al.** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **BLACKHAWK MINING, LLC, and** | ) |
| **PINE BRANCH MINING, LLC** | ) |
| | ) |
| **Defendants.** | ) |

**MOTION TO EXCLUDE THE OPINIONS OF D. SCOTT SIMONTON**
**\*\*\*\*\*\*\*\*\*\***

Defendants Blackhawk Mining, LLC ("Blackhawk") and Pine Branch Mining, LLC ("Pine

Branch" and together with Blackhawk the "Defendants"), by and through counsel, and for their

Motion to Exclude the Opinions of D. Scott Simonton, state as follows:

**<u>INTRODUCTION</u>**

In late July 2022 eastern Kentucky suffered one of the worst natural disasters in the

Commonwealth's history. Radar-based rainfall estimates indicate that 14 to 16 inches of rain fell

across the eastern Kentucky region between July 25 and July 30, 2022. *Historic July 26th-July

30th, 2022 Eastern Kentucky Flooding*, available at

https://www.weather.gov/jkl/July2022Flooding. This one in one-thousand-year rain event was

"historically unheard of." *Id.*; (Plfs. Resp. to RFA, Ex. 1). The impact of the storm was heightened

by the fact that the overwhelming amounts of rain fell across complex terrain characterized by a

high-relief landscape. *Id.*

The storm event caused flash flooding across the entire eastern Kentucky region, destroyed

communities, resulted in at least 45 deaths, and thousands lost power and water, in some instances,

for weeks. *See Eastern Kentuckians Continue to Recover One Year After Deadly Flooding,* available at https://www.wymt.com/2023/07/28/eastern-kentuckians-continue-recover-one-year-after-deadly-flooding/. President Biden issued a major disaster declaration in the wake of the flooding for 13 counties, including Breathitt County where the Plaintiffs reside or own property.[1] *President Joseph R. Biden, Jr. Approves Major Disaster Declaration for Kentucky*, available at https://www.fema.gov/press-release/20220729/president-joseph-r-biden-jr-approves-major-disaster-declaration-kentucky; DE 70, at ¶ 3.[2]

At the county level, Letcher County residents experienced the most flood damage (2,118 homes affected by flooding) and received the most federal housing assistance ($18,449,673) because of the unprecedented rain event. *See Housing Damage from the 2022 Kentucky Flood*, at p. 8, available at https://ohiorivervalleyinstitute.org/wp-content/uploads/2023/02/Housing-Damage-from-KY-2022-Flood.pdf. Twenty-two of the people who died resided in Knott County, the most of any county during the flooding. *See Siblings, grandparents, coal miners. These are the 45 victims of the 2022 Eastern KY floods*, available at https://www.kentucky.com/news/state/kentucky/article277457683.html.

Less than four weeks after the floods, the Plaintiffs in this action filed suit, claiming that the Defendants, *as opposed to the historic rain event*, were the cause of the flooding. (DE 1-1). Plaintiffs claimed that the Defendants failed "to operate their mining operations safely" and that they knew that their mining operations were a "ticking time bombs ready to explode." (Id.).

---

[1] The Plaintiffs assert that they lived or owned property in the River Caney Watershed, an area that typifies the complex terrain that the storms ravaged. The focal point of the River Caney Watershed where the Plaintiffs were located is characterized by a steep mountainous area divided by the "River Caney" creek bed along which the Plaintiffs built their residences.

[2] Illustrative of the far-reaching devastation caused by the storm event, residents of these 13 counties received Federal Emergency Management Agency ("FEMA") assistance totaling $107.9 million. *See DR-4663-KY Flooding Recovery Update by the Numbers*, available at https://www.fema.gov/sites/default/files/graphics/DR-4663-KY-infographic-flooding-by-the-numbers.jpg.

The Defendants sympathize with the circumstances of the Plaintiffs. The unprecedented rain event was a grievous occasion for the entire state, including for the Defendants, Pine Branch and Blackhawk, whose employees were among those that suffered. However, as set forth herein, Plaintiffs have not offered any evidence supporting their claims that it was the Defendants and not the unprecedented one-thousand year storm that caused their damages.

Plaintiffs' deadline to identify an expert to support their liability theory against Defendants passed on November 21, 2023. (DE 69, at p. 3). The only purported expert disclosure produced by the Plaintiffs was from D. Scott Simonton.  Simonton's disclosure, originally provided to the Court on February 13, 2023, does not meet the admissibility requirements of Fed. R. Evid. 702 or the disclosure requirements of Federal Rule of Civil Procedure 26.

First, while Simonton purports to conclude that Defendants' mining activities increased peak storm water runoff into the River Caney Watershed and was the "most likely causative factor" in the loss of life and property damage seen in the wake of the flooding, he does not provide any valid support for the conclusion. In particular, Simonton failed to conduct hydrologic modeling of the area in question, which is the industry standard for determining whether land disturbances have actually increased peak flow in an area. In fact, Simonton did no testing at all to determine, conclusively, whether peak storm water runoff was actually increased.

Simonton's purported opinions are based on nothing more than his "eye-balling" of satellite images, which have never been produced as required, and his own improper suggestion that because mining activities have increased peak storm water runoff in other locations during different weather events, they must have done so in this instance as well. Worse yet, Simonton never considers, let alone analyzes, whether there is an obvious alternative cause of the Plaintiffs' damages, such as *the 1,000-year storm event*, something that this Court has recognized is a clear

3

red flag about the reliability of a purported expert. *Ky. Waterways All. v. Ky. Utils. Co.*, 539 F. Supp. 3d 696, 710 (E.D. Ky. 2021). Because Simonton's opinions are not founded upon reliable principles and methods, nor are they based on sufficient facts and data, they are insufficient under Fed. R. Evid. 702 and should be excluded. Allowing Simonton to provide his conjecture about the cause of the flood will only confuse and mislead the jury, which the Rules of Evidence prohibit.

Simonton's Report should also be excluded because it does not meet the disclosure requirements of Rule 26. Not only is Simonton's reliance on studies of the impact of mining in other locations an invalid methodology for use in forming opinions about what happened in this case, Simonton never explains how he supposedly extrapolated the results from hydrologic studies conducted in other locations at different times to the location and events in question here. In other words, Simonton has failed to provide the basis for his opinions. Plaintiffs also failed to turn over multiple documents, including, but not limited to, the referenced studies, that Simonton allegedly reviewed and relied upon, which was also required by Rule 26. This failure also justifies exclusion pursuant to. Fed. R. Civ. P. 37(c)(1). [3]

For these and the reasons further set forth herein, Simonton's opinions should be excluded.

## BACKGROUND

On February 13, 2023, Plaintiffs filed a "Notice of Supplemental Answers to Interrogatories and Notice of Expert Witness Opinion" which attached a document titled "Preliminary Opinion, Caney Creek Flooding, Breathitt County, KY" authored by D. Scott Simonton, PE, PhD and dated February 10, 2023 (referred to herein as the "Report" or the "Simonton Report"). (DE 33). The Notice stated that all Plaintiffs would be calling Simonton as a witness "to testify as to the opinions referenced" in the Report. (*Id.*) At the time of the disclosure,

---

[3] Simonton also did not provide dates on which he is available for deposition, which was required by the Court's Scheduling Order. (DE 69).

the Court had not yet entered a deadline for the Parties to disclose experts pursuant to Fed. R. Civ. P. 26.

The Report states that Simonton was "asked to examine the facts associated with the substantial flooding event in [the River Caney Watershed][4] and community in late-July 2022." (Report at p. 1, Ex. 2). According to Simonton, he was specifically "asked to apply [his] education, training and experience in environmental engineering to offer an opinion as to whether mining activities in the watershed increased flood peak flows and flood damage during the event." (Report at p. 1, Ex. 2). The Report contains five sections, which are outlined below.

First, the Report's "Background" section describes the extreme weather event of July 2022 that is the center of this case. (Id. at pp. 1-2).  As Simonton acknowledges, between "July 25th and July 30th, 2022, several complexes of training thunderstorms developed south of I-64 and brought heavy rain, deadly flash flooding, and devastating river flooding" not just to the River Caney Watershed but to the entirety of the "eastern Kentucky and central Appalachia[n]" region. (Id. at p. 2). At times rainfall rates exceeded 4 inches per hour "across complex terrain" which led to 24 Flash Flood Warnings being issued between July 26th and July 30th and "widespread devastating impacts." (Id.).

Second, the "Mining Impacts and Hydrology" section purports to describe research papers on the potential impacts of mining on flooding and studies involving hydrologic modeling conducted in other areas (not the River Caney Watershed), at other times, which Simonton contends show that changes in land cover associated with mining in those locations had an impact

---

[4] As Simonton notes in his Report, the watershed is sometimes referred to as "Caney Creek" and sometimes referred to as "River Caney." The name of the roadway along which many of the Plaintiffs in this case reside is called "River Caney" and thus that is the term primarily used by the Defendants in this Motion.

on peak storm water runoff. (Id at pp. 3-6). Simonton, however, does not attach those studies to his report, nor does he provide a citation to any publication in which they can be found. (Id.).

Third, the "Mining in the Caney Creek Watershed" section generally discusses the fact that mining has occurred in the River Caney Watershed as well as the design structure of a sediment pond located on permitted land within the Watershed. (Id. at p. 6-7). Simonton indicates most other drainage structures constructed in connection with mining ultimately discharge to the subject pond prior to discharge into the headwaters of River Caney. (Id. at p. 6).

Fourth, the "Initial Opinions, Caney Creek Flood" section references photos that Simonton claims to have taken, but has not produced, purportedly showing erosion; references satellite images, also not produced, purportedly showing that there has been a decrease in the surface area of the referenced pond ("Pond 45") over time; describes precipitation data that Simonton claims to have reviewed, but also has not produced; and finally references the extensions of time in which Defendant Pine Branch has been given by the Kentucky Division of Mine Reclamation and Enforcement ("DMRE") to perform reclamation activities on mining permits located within the River Caney Watershed. (Id. pp. 6-9).

With no further analysis, the Report concludes with a fifth and final section, titled "Summary of Initial Preliminary Opinions," where Simonton leaps to several unsupported conclusions. Those conclusions, among others, are that mining activities in the River Caney Watershed caused an increase in peak storm water runoff, the sediment control structures constructed as part of mining activities were inadequate, and the increase in intensity and velocity of runoff caused by mining was "the most likely causative factor in the resulting loss of life and clearly exacerbated the property damage" suffered by the Plaintiffs. (Id. at p. 10).[5]

---

[5] The Simonton Report not only fails to meet the requirements of Rule 26 and Fed. R. Evid. 702, but it also does not match what the Plaintiffs actually allege occurred in their pleadings or during their depositions. In the operative Third

Notably, Simonton's Report does not include hydrologic modeling to substantiate any claim that peak flow was increased in this instance or, importantly, that but for increase in peak flow as a result of conditions created by the Defendants, the Plaintiffs would not have sustained the damages at issue. (Id. at pp. 7, 8, and 9). Simonton's Report also fails to consider alternative causes of Plaintiffs' flood damage, e.g., the 1,000-year rain event. Further, although it became a "final report" once the disclosure deadline passed, the Report is itself described as Dr. Simonton's "Preliminary Opinion, Caney Creek Flooding, Breathitt County, KY" and throughout it Simonton notes that the opinions contained therein are his "initial preliminary opinion" and he suggests that he is continuing to review information regarding the flooding in River Caney although he has never provided an updated report. (Id. at pp. 1, 6, 9, and 10).

On July 17, 2023 this Court entered a scheduling Order directing the Plaintiffs to disclose the identity of expert witnesses who may be used in this case and written reports by the expert witnesses as required by Rule 26(a)(2) by November 21, 2023. Further, the Court directed that at the time expert reports are exchanged, the disclosing party is to provide at least two proposed dates for the deposition of each expert witness within the following thirty days. (DE 69, at p. 4). Plaintiffs did not disclose any additional or supplemental report for Dr. Simonton by the November 21, 2023 deadline, did not disclose any dates for his deposition by the November 21st deadline, and did not disclose any other experts by the deadline either.

---

Amended Complaint, Plaintiffs do not contend that there was an increase in peak storm water runoff but instead appear to contend that a sedimentation pond actually failed, i.e. "broke", and flooded the valley cradled between two exceedingly steep hillsides where the Plaintiffs lived. (DE 70, at ¶ 7) ("The Plaintiffs state that, based on information they have received, Defendants operated a number of silt ponds which failed due to the fact that they were improperly maintained and improperly constructed. The failure of the silt ponds caused debris and excessive water to flow onto the Plaintiffs' properties and caused damages as described elsewhere in this Complaint."). This is also consistent with what a majority of the Plaintiffs have testified to during their depositions – that they believe a sedimentation or silt pond actually "broke" or "busted" spewing water into the valley. (Deposition Excerpts, Ex. 3). The Plaintiffs have failed to put forth any proof at all to support this theory and Simonton has also not opined that this is a legitimate explanation for what happened.

As set forth herein, Simonton's purported opinions are deficient under Fed. R. Evid. 702, as they are not the product of reliable principles and methods reliably applied nor are they supported by sufficient facts and data.  Further, Simonton's Report fails to comply with the disclosure rules set forth in Rule 26(a). Accordingly, Simonton should be precluded from providing testimony at any trial in this matter.

## ARGUMENT

I.   **Simonton's Report Fails to Meet the Requirements of FRE 702 Because His Opinions are Not the Product of Reliable Principles and Methods and are Not Supported by Sufficient Facts and Data.**

Under Fed. R. Evid. 702, expert testimony is admissible only if it is the product of reliable principles and methods and the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702 also requires that the opinions be "based on sufficient facts or data." Simonton's opinions fail to meet these requirements because he failed to conduct the industry standard hydrologic modeling that is necessary to determine whether a land disturbance has increased peak flow; he improperly attempts to extrapolate findings from modeling in other locations during different storm events to this case; and he failed to analyze whether an obvious alternative cause – a 1,000-year rain event – led to the Plaintiffs' damages.

A.   **Simonton's opinions are unreliable because he failed to conduct flood modeling – the accepted methodology to determine whether land disturbances caused or exacerbated flooding.**

As this Court noted in *Ky. Waterways All. v. Ky. Utils. Co.*, "[i]n general, '[f]our inquiries guide the reliability analysis: Is the technique testable? Has it been subjected to peer review? What is the error rate and are there standards for lowering it? Is the technique generally accepted in the relevant scientific community?'" *Ky. Waterways All.*, 539 F. Supp. 3d at 710 (quoting *United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021)). Further, an all-out "lack of testing" is a "red flag" that weighs against admission of purported expert testimony. *Id.* (quoting *Newell*

*Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012)). Not only did Simonton fail to conduct the industry standard hydrologic modeling to determine whether there was actually an increase in peak flow resulting from land disturbances in this case, *he failed to conduct any testing at all*.

The National Judicial College has published the Hydrologic Modeling Bench Book. The initiative is a collaboration between state and federal judges, special masters, magistrates and administrative officers who preside over water rights adjudications, interstate cases arising out of water issues, or other water related litigation. The purpose of the initiative is to "enhance and improve judicial understanding of the challenging issues impacting water adjudication" including understanding and applying science to water litigation. THE NATIONAL JUDICIAL COLLEGE, HYDROLOGIC MODELING BENCHBOOK, DIVIDING THE WATERS (2010), at Forward, available at https://www.judges.org/wp-content/uploads/2020/03/DTW-Hydrologic-Modeling-Benchbook.pdf.

As the Bench Book notes, "[i]n practice, natural hydrologic systems are inherently complex." *Id.* at p. 26. These systems "can rarely be described in simple terms, nor can their behavior be predicted with anything less than a computer-based hydrologic simulation model." *Id.* at p. 27. In complex hydrologic systems, like the one at issue, "the task of attempting to establish the behavior features of the system is rarely performed without a simulation model. Furthermore, the complexity of the system is magnified by the fact that in almost all circumstances, certain 'inputs' to the system like river flows and precipitation are not predictable with any certainty and must be treated probabilistically." *Id.* As a result, the National Judicial College has stated that "[c]omputer-based hydrologic models have proven helpful, ***in fact essential,*** in a variety of water disputes" including cases like this. *Id.* at p. 31 (emphasis added).

9

In recognition of the necessity of hydrologic modeling in cases such as this, where the ultimate question is whether a man-made disturbance impacted flooding in an area, courts across the federal circuits have endorsed the use of HEC-RAS and HEC-HMS hydrologic modeling.[6] *Union Pac. R.R. Co. v. Winecup Ranch*, No. 3:17-cv-00477-LRH-CLB, 2020 U.S. Dist. LEXIS 228006, at *11-12 (D. Nev. Dec. 4, 2020) (Holding that the HEC-HMS hydrologic model is the "industry standard used by the Army Corps of Engineers . . . to simulate and re-create hydrologic process of watershed systems" and that "HEC-HMS and HEC-RAS are probably the most extensively applied water-related modeling systems in the world"); *Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 713-14 (D.S.C. 2019) ("[B]ecause HEC-RAS has been explicitly endorsed and 'general[ly] accept[ed]' by government agencies and private firms operating within this specialized field, the court finds that this factor endorses the reliability of [the expert's] methodology, and the court accords this factor great weight."); *Alost v. U.S.*, 73 Fed. Cl. 480, 495 (Fed. Cl. 2006) (HEC-RAS modeling recognized), *aff'd sub nom. Morgan v. U.S.*, 254 Fed. App'x 823 (Fed. Cir. 2007); *Watkins v. Lawrence Cty.*, No. 3:17-cv-00272-KGB, 2020 U.S. Dist. LEXIS 88931, at *13-14 (E.D. Ark. May 19, 2020) (noting that "numerous federal courts have admitted expert testimony using HEC-RAS modeling at trial").

Indeed, Simonton himself recognizes the importance of hydrologic modeling in his Report, citing to other studies that he claims to have been personally involved in, in other locations analyzing other flood events, where he claims modeling was used to affirmatively prove that changes in land cover conditions resulting from surface mining caused an increase in peak storm

---

[6] HEC-HMS is a software program developed and maintained by the U.S. Army Corps. of Engineers Hydrologic Engineering Center. According to the Corps' website, the program "is designed to simulate the complete hydrologic process of dendritic watershed systems." *See* https://www.hec.usace.army.mil/software/hec-hms/. HEC-RAS is another software program developed and maintained by the Corps that "allows the user to perform one-dimensional steady flow, and one and two-dimensional steady flow calculations, sediment transport/mobile bed computations, and water                    temperature/water                    quality                    modeling." *See* https://www.hec.usace.army.mil/software/hec-ras/.

water runoff. (Simonton Report at pp. 4-6, Ex. 1) (referencing "hydrologic modeling (HEC-HMS and HEC-RAS)" utilized to study a July 2010 rain event in Pike County, KY; "[a] similar study using HEC-HMS" related to a May 9, 2009 flooding event in Mingo County, West Virginia; and another study conducted by Simonton and others in Middlesboro, Kentucky where "3 impacted watersheds were modeled using HEC-HMS").

In other matters Simonton has even testified, affirmatively, that one cannot reach the types of conclusions that he purports to reach in this case about the impact of land disturbances on flooding without first conducting modeling. When asked during a deposition about quantifying the impact of a proposed natural gas pipeline on water quality and flow in streams and waterways, Simonton responded that he did not think it could be done without modeling:

> Generally on a project like this, especially one that may impact flow and flooding --- I mean, *I've never seen where modeling was not included.* I mean, it's --- it's --- *it's kind of the standard* is before, during and after modeling of --- of impacts and changes to the --- to the stream channel. I mean, *that's just how these things are done.* So opinion on what – whether or not there will or will not be impacts without giving at least that basic level of analysis, honestly I don't – *I don't know how you do it.* I – I – really don't . . .

(Dep. of S. Simonton, *Vanessa Allen, et al. v. LG&E, et al.*, File No. DOW-19-1-0319, Commonwealth of Kentucky Energy & Environment Cabinet dated July 16, 2020 at pp. 103:9-104:5, Ex. 4) (emphasis added). As recent as March 9, 2023, Simonton submitted a report in another matter where he concluded that it is *impossible to accurately measure the impact* of a land disturbance without modeling:

> I have not seen hydrologic modelling of the proposed floodplain changes by the developer. To accurately understand the impacts this development will have on hydrology in the watershed, *these models **must** be developed.* As this has not been done, *it is impossible for anyone to fully determine the impact* of this development on environmental characteristics, including impacts on water quality, the floodplain, wetlands, natural drainage ways, steep slopes, soils, etc.

(Excerpts from Report on Floyds Fork Watershed Matter, Ex. 5) (emphasis added).

In this case, however, Simonton failed to conduct any modeling or testing that could actually link changes in land cover resulting from mining to the flooding and damages that occurred during the one-thousand-year rain event that occurred in eastern Kentucky in July 2022. Although he notes the importance of modeling in other cases that he has been involved in – indeed, he says it is impossible to reach valid opinions without it - he chose not to engage in modeling in this case. Instead, Simonton merely reviewed satellite imagery (that has never been produced by the Plaintiffs) and then catapulted to the conclusion that an increase in peak flow resulted from mining activities. Simonton fails to cite any authority establishing that such an "eye-ball" method of analysis is reliable or accepted in the first instance – because it is not. By Simonton's own admission, the opinions he purports to provide can only be reached with modeling. Simonton's opinions are not the product of reliable principles and methods and should be excluded as they lack any accepted scientific foundation and will only confuse the jury and prejudice the Defendants.

**B.  Simonton's opinions are also unreliable because he essentially opines that since mining has increased the peak flow in other locations and under different conditions, it did so in this case.**

Instead of conducting any actual testing of his own, Simonton attempts to graft onto this case the results of other studies (which again, the Plaintiffs have failed to produce) that purportedly found a link between mining and an increase in peak storm water runoff in other locations and under different conditions. However, "reliance on anecdotal evidence" and "improper extrapolation" is yet another indication that a purported expert has not utilized a reliable methodology in forming opinions. *Ky. Waterways All.*, 539 F. Supp. 3d at 710. Additionally, opinions, which do not rely on any actual field analysis of the subject location, but instead the outcome of studies in other locations under different conditions, lack the support of sufficient facts

and data necessary to permit admission. *Gulf Restoration Network v. Oscar Renda Constr., Inc.,* Cause No. 1:17CV130-LG-RHW, 2018 U.S. Dist. LEXIS 77907 (S.D. Miss. May 9, 2018).

As one federal court noted in a similar case involving opinions about the impact of land disturbances on a watershed, "a court may rightfully exclude expert testimony when an expert has extrapolated data, and there 'is too great an analytical gap between the data and the opinion offered.'" *Gulf Restoration Network*, 2018 U.S. Dist. LEXIS 77907 at *8 (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)). In *Gulf Restoration Network,* the court excluded the opinions of a purported expert that a lack of adequate safeguards at a construction site likely resulted in a large increase in sediment runoff into the Biloxi Back Bay because the expert failed to conduct a study of the area in question but instead based his opinions on his knowledge that such effects have been measured in other instances. *Id.* at *8-9. The court stated that it was not "required 'to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.'" *Id.* (quoting *Gen. Elec. Co.*).

The expert issues in this case are nearly identical to *Gulf Restoration Network*. Simonton's reliance on other studies in other locations and publications that discuss, in general terms, the potential impact of mining on flooding, is insufficient to allow Simonton to present these alleged "theories" at trial as they are similarly unreliable.

### C. Simonton's opinions are unreliable because he failed to exclude alternative causes such as the fact that the entire region suffered from a 1,000-year rain event.

Simonton failed to consider that the damages claimed by Plaintiffs were caused by the 1,000-year rain event. His failure to do so is another "red flag" indicating that his opinion is not reliable. *Ky. Waterways All.*, 539 F. Supp. 3d at 710.

In *Tri-Con, Inc. v. Union Pac. R.R. Co.,* the plaintiff's expert, a civil engineer with a background in roadway design, storm drainage systems, water and sewer utilities, and site design,

sought to testify as to the "factors that might have contributed to the flooding of the [Plaintiff's] [property]" and in particular whether the change in the size of certain culverts was the cause of flooding on the plaintiff's property. *Tri-Con, Inc. v. Union Pac. R.R. Co.,* No. 1:20-CV-535-MAC-CLS, 2023 U.S. Dist. LEXIS 140624, at *7 (E.D. Tex. July 31, 2023).  The expert's opinions were based on his personal observation of flooding that occurred at the property on September 24, 2019, and his review of the surrounding area, construction plans, drainage reports, and other documents. *Id.* The defendant argued that the expert's hydrology opinions were unreliable because he failed to consider alternative causes of the flooding to the Property, "such as water runoff from upstream or the large amount of rain that fell directly on the Property." *Id.*

After analyzing the circumstances of the case, the court agreed with the defendant, holding that the purported expert's opinions were unreliable and should be excluded. The court held that to "testify that the culverts were the but-for cause of the flooding to the Property, his causation opinions must meet the reliability standards of Rule 702" and "[a] necessary ingredient [for opinions on causation] is the exclusion of alternative causes."  *Id.* at *8 (citing *Cooper v. Meritor, Inc.*, No. 4:16-CV-52-DMB-JMV, 2019 U.S. Dist. LEXIS 21788, 2019 WL 545187, at *19 (N.D. Miss. Feb. 11, 2019)). The expert's causation opinion was found to be unreliable because he failed to exclude an "obvious" alternative cause for the flooding at issue. The court held that the expert never considered whether "the flooding would have occurred regardless of the change in culvert size due to, for example, water runoff from other areas or the unprecedented rainfall from Hurricane Harvey and Tropical Storm Imelda" and "Hurricane Harvey and Tropical Storm Imelda resulted in unprecedented and severe flooding in the affected areas across the region . . ." *Id.* at *9.

Similarly, here, Simonton presents no analysis of water flows – pre or post mining, and completely failed to consider an obvious alternative cause of the Plaintiffs' claimed damages – a

14

1,000-year storm that devastated not only the River Caney Watershed (where the mine site is located) but the entire eastern Kentucky region. Simonton's failure to consider this obvious alternative cause, just like his failure to produce an opinion that otherwise meets the requirements of Fed. R. Evid 702, is grounds for exclusion.

## II.   Simonton's Opinions Should Be Excluded For Failure to Comply With the Expert Disclosure Requirements in Fed. R. Civ. P. 26(a).

Even if Simonton's opinions did qualify for admission under Fed. R. Evid. 702, and they do not, exclusion would still be warranted because of Simonton's failure to meet the disclosure requirements set forth in Fed. R. Civ. P. 26(a).

Rule 26(a)(2)(B) required that Simonton's Report include:

(i) a complete statement of all opinions the witness will express *and the basis and reasons for them*;
(ii) the facts or data considered by the witness in forming them;
(iii) any exhibits that will be used to summarize or support them;
(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
(vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). However, Simonton's Report fails to meet these requirements as it fails to disclose any basis for his opinions; the Plaintiffs have failed to produce a number of items that Simonton claims to have considered in forming his opinions; the Plaintiffs have failed to produce a number of purported exhibits or attachments to Simonton's report; the Plaintiffs have failed to identify the matters in which Simonton has testified in the previous four years; and the Plaintiffs have failed to provide a statement as to Simonton's compensation. Last, contrary to the Court's Scheduling Order, DE 69, Plaintiffs have failed to provide dates on which Simonton is available for deposition. For these reasons as well, exclusion of Simonton's testimony is warranted.

**A. Simonton's "Preliminary" Report Fails to Set Forth a Complete Statement of the Basis and Reasons for His Opinions; The Report Instead Provides Only Simonton's *Ipse Dixit* Opinion as to the Cause of the Plaintiffs' Damages.**

As this Court has previously held, "Rule 26(a) requires that an expert's written report must contain 'a complete statement of all opinions the witness will express and the basis and reasons for them.' Fed. R. Civ. P. 26(a)(2)(B)(i). '[A]n expert opinion must set forth facts and, in doing so, outline a line of reasoning arising from a logical foundation.'" *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt., LLC,* Civil Action No. 5:11-374-DCR, 2014 U.S. Dist. LEXIS 57653, at *11-12 (E.D. Ky. Apr. 25, 2014) (citing *Brainard v. Am. Skandia Life Assur. Corp.,* 432 F.3d 655, 664 (6th Cir. 2005)). Further "[e]xpert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *James T. Scatuorchio Racing Stable, LLC,* 2014 U.S. Dist. LEXIS 57653, at *11-12 (quoting *Salgado by Salgado v. GMC,* 150 F.3d 735, 742 n.6 (7th Cir. 1998)).

Courts are "not required 'to admit opinion evidence connected to existing data only by the *ipse dixit* of the expert.'" *Kilgore v. United States,* 2023 U.S. Dist. LEXIS 63164, at *10 (E.D. Ky. Apr. 11, 2023); *Ky. Waterways All.,* 539 F. Supp. 3d at 713. Exclusion is warranted if a purported expert fails to articulate the basis for a conclusion. *See, e.g., Am. Cas. Co. v. Reynolds Concrete Plumbing, LLC,* 2021 U.S. Dist. LEXIS 130180, at *12 (E.D. Ky. July 13, 2021) (excluding expert); *Ky. Waterways All.,* 539 F. Supp. 3d at 713 (excluding opinions about a "pre-swim-up mortality" of fish when no data supporting the opinion was disclosed); *Vaughn v. Konecranes, Inc.,* 2015 U.S. Dist. LEXIS 47855, at *9 (E.D. Ky. Apr. 13, 2015) (excluding expert).

While Simonton's Report concludes with a so-called summary of his "Initial Preliminary Opinions,"[7] where he claims that the Defendants' actions were a "causative factor" in loss of life

---

[7] Notably, "[p]reliminary reports do not satisfy the requirements of Rule 26(a)" and are excluded by courts because they fail to fully articulate reasoning for opinions given. *James T. Scatuorchio Racing Stable, LLC,* 2014 U.S. Dist.

and property damage, he never provides his reasoning for how he reached these conclusions. He notes that mining has occurred in the River Caney Watershed, says hydrologic modeling was conducted *in other areas* outside of the River Caney Watershed *on different occasions*, and claims to have reviewed unproduced photographs showing erosion in the River Caney Watershed and a reduction in the surface area of a sediment pond, but he never explains how these things allow him to reach the conclusions he offers in this case.

Plaintiffs have failed to comply with Rule 26's requirement that they produce an expert report that sets forth a complete statement of the purported expert's opinions as well as the "the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B).

### B. Plaintiffs have failed to produce all facts and data considered by Simonton and exhibits that he claims support his opinions.

Not only does Simonton's Report fail to set forth any real basis for his conclusions, the Plaintiffs have also failed to produce the items that Simonton claims to have considered in forming them. Simonton's Report details several items that Simonton claims to have reviewed as well as items that he appears to have intended to make attachments to his Report:

- Photos from a September 15, 2022 site visit that Simonton claims to show sediment deposits in River Caney (Simonton Report at p. 7, Ex. 2);

- Photos associated with an August 6, 2022 inspection (Id. at p. 8);

- "Photo 1," "Photo 2" and "Photo 3" which appear to be references to exhibits or attachments to Simonton's Report (Id. at pp. 8 and 9);

- Precipitation data, including KY MESONET data from July 25, 2022 through July 31, 2022 (Id. at p. 8);

---

LEXIS 57653, at \*11-12 (quoting *Salgado by Salgado,* 150 F.3d at 741 n.6). Other courts have held the same. *See e.g., In re TMI Litigation Cases,* 922 F. Supp. 997, 1005 n.9 (M.D. Pa. 1996); *Smith v. State Farm Fire & Cas. Co.,* 164 F.R.D. 49, 53-54 (S.D. W. Va. 1995) *Kern River Gas Transmission Co. v. 6.17 Acres of Land,* 156 F. App'x 96, 102 (10th Cir. 2005). Although Simonton's Report is "final" in that he cannot correct the severe deficiencies identified herein given that the expert disclosure deadline has now passed, on no less than five occasions, Simonton says unmistakably that the opinions in his Report are only preliminary and not yet complete. (Simonton Report at pp. 1, 6, 9, and 10).

- KML/Google Earth files and images, including Google Earth Pro photographs dating to October 2013, June 2014, July 2021, and October 2022 (Id. at pp. 1 and 7);

- USGS topographic maps (Id. at p. 1);

- USGS surface water data (Id. at p. 1);

- Media and government reports related to the event (Id. at p. 1);

- Materials relating to interviews he conducted with certain Plaintiffs, including but not necessarily limited to, Bridgette Fugate and Gregory Chase Hays (Id. at pp. 3);[8]

- A 2002 study conducted by the West Virginia Department of Environmental Protection Flood Analysis Technical Team (Id. at p. 4)[9];

- Materials from a study relating to a July 2010 Pike County rain event, including HEC-MES and HEC-RAS modeling (Id. a p. 4);

- Materials from a May 2009 flood event in Mingo County, West Virginia, including HEC-HMS modeling (Id. at p. 5);

- Materials from a "more recent and similar study" relating to flooding in the Upper Pigeon Creek watershed (Id. at p. 5);

- Materials from a study relating to June 2011 flooding in three watersheds in Middlesboro, Kentucky, including HEC-HMS modeling (Id. at p. 5);

- Materials from a study relating to June 2011 flooding in Kayjay, Kentucky (Id. at p. 6);

- Unspecified Kentucky Energy and Environment Cabinet documents that Simonton claims to have received in response to a "FOIA" request (Id. at pp. 1 and 6);

- The Mining and Reclamation Plan Maps for Permit Nos. 897-0568 and 897-0271 (Id. at P. 6);[10] and

---

[8] It is not clear from Simonton's Report whether "statements" by these witnesses were oral or written.

[9] Simonton also identifies several publications that have not been produced but Defendants have been able to locate at least some of those publications based on citations provided.

[10] Plaintiffs may claim that certain of these items are publicly available and while they may very well be, unless the actual documents Simonton reviewed and relied on are produced, there is no way to tell whether they are the same documents that Defendants can gain access to. Further, Simonton's claim that he has reviewed documents from the Cabinet, generally, leaves the Defendants to guess at which documents he actually considered an relied upon, which contradicts the spirt of Rule 26's disclosure requirements.

- A document titled "ATTACHMENT_29_4H_SEDCAD" and another titled "ATTACHMENT_29_4c_SWS" which both appear to relate to Permit No. 897-0568 (Id. at pp. 6 and 7).

Pursuant to Rule 26, Plaintiffs were required to produce these items and Pine Branch specifically requested that the items be turned over in response to its Requests for Production of Documents. (Pine Branch Request for Production No. 23, Ex. 6).[11] Since these items have not been produced, Plaintiffs have failed to meet the requirements of Rule 26 with respect to Simonton's disclosure.

### C. Plaintiffs have failed to provide an actual list of all other cases Simonton has testified in during the previous 4 years; have failed to provide a statement of compensation; and failed to provide deposition dates as required by the Court's Scheduling Order.

Plaintiffs have also failed to provide an actual list of all other cases that Simonton has testified in, whether by trial or deposition, within the last 4 years and have failed to disclose his compensation. Fed. R. Civ. P. 26(a)(2)(B)(v)-(vi). Plaintiffs also failed to comply with the Court's Scheduling Order requiring Plaintiffs to provide at least two dates on which Simonton was available for deposition in the 30 days following the November 21, 2023 disclosure deadline. (DE 69).

### D. Failure to Comply with Rule 26(a) Requires Exclusion of Simonton's Testimony

"When a party does not comply with Rule 26(a) or (e), it is 'not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.'" *James T. Scatuorchio Racing Stable, LLC,* 2014 U.S. Dist. LEXIS 57653, at *28-29 (quoting Fed. R. Civ. P. 37(c)(1)). "The test for exclusion under 37(c) is

---

[11] The Defendants will not detail here again the extensive efforts made by the Defendants and this Court to have the Plaintiffs fully and timely respond to written discovery as those efforts are well-documented in the record. *See* (DE 36, 37, 49).

'very simple: the sanction is mandatory unless there is a reasonable explanation of why Rule 26 was not complied with or the mistake was harmless.'" *Id.* (quoting *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.,* 596 F.3d 357, 370 (6th Cir. 2010). There is no reasonable explanation for why the Plaintiffs in this case have failed to comply with the requirements of Rule 26. Plaintiffs disclosed Simonton nearly a year ago and have not within that time, leading up to the actual disclosure deadline implemented by the Court, supplemented Simonton's report to make it compliant with Rule 26. The failure is also not harmless, as without a proper disclosure Defendants are hamstrung in defending against Simonton's *ipse dixit* opinions.

To the extent the Plaintiffs attempt to argue in response to this Motion that Simonton can provide the information omitted from his Report through deposition and that they can thus cure the deficiencies under Rule 26 or that the Defendants should have first moved to compel the Plaintiffs' compliance with Rule 26, the law states otherwise. "Generally, it is not appropriate to consider depositions as a means to cure the deficiencies in an expert report." *James T. Scatuorchio Racing Stable, LLC,* 2014 U.S. Dist. LEXIS 57653, at *12-13 (citing *Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 642 (7th Cir. 2008)). "This is because allowing a party to remedy a deficient report through a later deposition would counter the goals of Rule 26(a)."[12] *Id.*

The expert disclosure to be provided under Rule 26 is intended to stand on its own and as the Advisory Committee Notes indicate: "The requirement under subdivision (a)(2)(B) of a complete and detailed report of the expected testimony of certain forensic experts may, moreover, eliminate the need for some such depositions or at least reduce the length of the depositions." Notes of Advisory Committee on 1993 Amendments to Fed. R. Civ. P. 26. Defendants were neither required to first depose Simonton to give him a chance to cure deficiencies nor were they required

---

[12] Plaintiffs also failed to provide dates on which Simonton was available for deposition within the 30 days following the disclosure deadline in any event.

20

to first ask the Court to compel compliance through a Court Order before bringing this Motion – the obligations under Rule 26 are mandatory. *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (6th Cir. 2004) ("The exclusion of non-disclosed evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless."); *Big Sandy Co., L.P. v. Am. Carbon Corp.*, No. 21-88-DLB-EBA, 2023 U.S. Dist. LEXIS 205388, at *25 (E.D. Ky. Nov. 16, 2023) ("ACC cites to no authority, nor has the Court's independent research uncovered any, that requires a plaintiff to file a motion to compel information from expert reports before they can obtain relief in a motion to exclude. Such proposition would run counter to Rules 26(a) and 37(c), as well as Sixth Circuit precedent, that the exclusion is automatic and mandatory without justification from the party that did not make the proper disclosure.").

As such, exclusion of Simonton's testimony is automatic and required.

## CONCLUSION

WHEREFORE, for the above stated reasons, Defendants respectfully request that Simonton be excluded from testifying in the trial of this matter.

Respectfully submitted,

*/s/ Grahmn N. Morgan*
Grahmn N. Morgan (KBA #89219)
Kristeena L. Johnson (KBA #94994)
James M. McClure (KBA #99580)
DINSMORE & SHOHL LLP
100 W. Main St., Suite 900
Lexington, KY 40507
T: (859) 425-1000
F: (859) 425-1099
grahmn.morgan@dinsmore.com
kristeena.johnson@dinsmore.com
mac.mcclure@dinsmore.com

and

21

R. Clay Larkin
Dentons Bingham Greenebaum LLP
300 West Vine Street, Suite 1200
Lexington, KY 40507
T: (859) 231-8500
clay.larkin@dentons.com
*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

This is to certify that I electronically served and filed the foregoing with the Clerk of the Court using the CM/ECF system on this 4th day of January, 2024, which will give notice to all parties of record.

/s/ Grahmn N. Morgan
*Counsel for Defendants*