UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON
CASE NO. 5:22-cv-231-DCR

| | |
|---|---|
| EUGENE BAKER, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| BLACKHAWK MINING, LLC, and | ) |
| PINE BRANCH MINING, LLC | ) |
| | ) |
| Defendants. | ) |

DEFENDANTS' CONSOLIDATED RESPONSE AND
CROSS-MOTION FOR FULL SUMMARY JUDGMENT
**********

Defendants Blackhawk Mining, LLC ("Blackhawk") and Pine Branch Mining, LLC ("Pine Branch"),[1] by and through counsel, and for their Consolidated Response and Cross-Motion for Full Summary Judgment, state as follows:

## INTRODUCTION

This case arises from the historic July 2022 storm event that ravaged much of eastern Kentucky. The storm event was a natural disaster of epic proportions. Merely days after flood waters receded, Plaintiffs, who reside in an isolated mountain valley (i.e. hollow), in Breathitt County and within the River Caney watershed, filed this lawsuit claiming that Pine Branch's coal mining operations,[2] not the torrential and unprecedented rain, caused the flash flooding that damaged their homes and personal property.

---

[1] Blackhawk and Pine Branch are collectively referred to herein as the "Defendants".

[2] Pine Branch operates the "Combs Branch" surface mine straddling Breathitt and Perry Counties, and consisting of Permit Nos. 897-0568 and 897-0569. (Ricci Report, at p. 13, Ex. 1). The site was originally permitted by Pine Branch Coal Sales Inc., the predecessor owner of the site. (Id.). Blackhawk does not hold any permits for the site and its only involvement is as an "upstream" parent of Pine Branch. (Id.); (DE 1). Plaintiffs live below the operation in a hollow within the River Caney watershed near Lost Creek, Kentucky. (Ricci Report, at p. 8, Ex. 1).

When they filed, Plaintiffs had no evidence that Pine Branch's mining operations caused or contributed to the flooding. Almost two years later, and with discovery now closed, Plaintiffs still have not produced any competent evidence that mining conducted by Pine Branch caused or contributed to their damages. As such, this Court should not only deny Plaintiffs' pending Motion for Partial Summary Judgment ("Plaintiffs' Motion"), (DE 139), but should also grant summary judgment in full in favor of the Defendants.

There is no question of fact for a jury to consider in this case.  Plaintiffs themselves have no personal knowledge or understanding of how Defendants could be liable for this natural disaster. Moreover, while Plaintiffs, at the outset, admitted that expert testimony is required to prove liability, the Court excluded Plaintiffs' only causation expert, D. Scott Simonton, after finding that his "report" offered only bare conclusions unsupported by any scientific methodology.

As a result of the Court's ruling, the only competent causation opinions offered in this case come from the Defendants' expert, Michael Ricci, P.E., with the engineering firm RESPEC, who used *the industry standard HEC-HMS and HEC-RAS* modeling to compare the extent of flooding observed during this historical rain event under then current conditions to that which would have been observed under pre-mining conditions. Mr. Ricci's analysis concluded that Defendants' mining did not cause or even contribute to the Plaintiffs' damages. The modeling demonstrates, conclusively, that features of the mine site as of July 2022 actually *reduced the flow* of water into River Caney and correspondingly *reduced* the surface area and depths of the flood waters as compared to pre-mining conditions.[3] (Ricci Report, Ex. 1).

---

[3] Even though mining companies are not required to design their mine sites, including their sediment ponds, to control for 1,000 year storms, as set forth in Mr. Ricci's report, hydrologic modeling shows that the damage would have been far worse under pre-mining conditions. In other words, if anything, the mine site mitigated the impact of this historic flooding on these particular Plaintiffs and their properties.

Defendants do not deny that many in eastern Kentucky, including Plaintiffs, suffered because of the unprecedented storm event. Defendants and their employees were impacted as well. But the fact remains that there is no evidence that Defendants caused or contributed to the harm alleged.

Moreover, Plaintiffs' argument that the Court should rule, as a matter of law, that Defendants have breached certain mining regulations also lacks merit. Not only are the Plaintiffs unable to prove that, even if the cited regulations were violated, such a violation caused or contributed to their harm, the Kentucky Energy and Environment Cabinet ("Cabinet") never even issued notices of noncompliance ("NNCs")[4] alleging violation of the regulations relied upon by Plaintiffs.  As a result, no Final Order from the Cabinet exists as to these alleged violations, precluding a claim for negligence per se.[5]

Summary judgment should be granted in favor of the Defendants as Plaintiffs have failed to establish violation of any standard of care.  And even if they could, Plaintiffs have no evidence

---

[4] If a Cabinet inspector believes there is a violation of surface mining law under KRS Chapter 350 or 405 KAR Chapters 7 through 24, he issues an NNC describing the nature of the perceived violation and any remedial action required. 405 KAR 12:020 Section 2(1)-(2). The NNC itself is not final, however, because the relevant statutory scheme requires an "opportunity for a hearing" prior to the issuance of a "final order." KRS 350.028(4). Following issuance of an NNC, the permittee may file a petition for review with the Office of Administrative Hearings. KRS 350.0301; 400 KAR 1:110 Section 7; *see also* 400 KAR 1:001(10). Following a hearing, the hearing officer issues a report and recommended order with findings of fact and conclusions of law. KRS 350.0301(2). The parties may then file exceptions to the hearing officer's report and recommended order. *Id.* The Secretary of the Cabinet next "consider[s] the report, exceptions, and recommended order [to] decide the case." *Id.* "The decision" of the Secretary constitutes a "final order of the [C]abinet" ("Final Order"). *Id.* That Final Order can then be appealed to state court. KRS 350.0305.

[5] The only NNCs identified by the Plaintiffs as being issued pre-flood, were those related to the time in which Pine Branch was required to reclaim certain highwall. (Agreed Order, Ex. 2). However, the Cabinet agreed to a modified timeline for reclamation before the storm event took place and the Plaintiffs do not dispute that Pine Branch was in compliance with this new and controlling timeline as of the rain event. Further, the Cabinet has never even insinuated that these past NNCs, which were resolved through the Order establishing the new timeline, caused or contributed to the Plaintiffs' claimed damages. Finally, as to the one NNC issued post-flood that the Plaintiffs raise, related to erosion near a sediment pond, the NNC itself recognizes that the issue identified was not caused by any act or omission on the part of Pine Branch but instead the storm event itself. (D. Wilson Depo., DE 136-1, at PageID# 827:25-829:13).

that Defendants' actions caused or contributed to Plaintiffs' damages. For these and the reasons set forth herein, Plaintiffs' Motion should be denied and Summary Judgment should be entered in favor of Defendants.[6]

## UNDISPUTED MATERIAL FACTS

In July 2022, eastern Kentucky experienced a "historically unheard of" rainfall, resulting in one of the worst natural disasters in the Commonwealth's history.[7] The storm event caused flash flooding across the entire region, destroyed communities, and caused at least 45 deaths (the majority occurring in Knott County).[8] Disaster declarations were issued for nearly the entire eastern half of the state at both local and national levels.[9]

Plaintiffs' claims focus on the destruction caused in Breathitt County by the storm event, and in particular, the River Caney hollow, named for the creek that flows through it. (DE 70). River Caney is in the southern-most part of the county and traces its name-sake creek, which runs approximately 3 miles until it meets the North Fork of the Kentucky River. (Ricci Report, p. 8 and Appx. A, Ex. 1).

The 3,507-acre drainage area that makes up the watershed encompassing River Caney (the "River Caney Watershed") is comprised mostly of steep, forested mountains and narrow valleys. (Id at pp. 8, Fig. 1, and Appx. A). Pine Branch's surface mine, known as "Comb's Branch," sits in the southeastern portion of the River Caney watershed and includes two mine permits, Nos. 897-

---

[6] Plaintiffs requested partial summary judgment with respect to all Plaintiffs in their Motion. (DE 139). Defendants likewise address all Plaintiffs in this consolidated response and cross-motion.

[7] *Historic July 26th-July 30th, 2022 Eastern Kentucky Flooding*, available at https://www.weather.gov/jkl/July2022Flooding.

[8] *See Eastern Kentuckians Continue to Recover One Year After Deadly Flooding,* available at https://www.wymt.com/2023/07/28/eastern-kentuckians-continue-recover-one-year-after-deadly-flooding/.

[9] *See, e.g.,* President Joseph R. Biden, Jr. Approves Major Disaster Declaration for Kentucky, available at https://www.fema.gov/press-release/20220729/president-joseph-r-biden-jr-approves-major-disaster-declaration-kentucky.

0568 and 897-0569. (Id. at pp. 8, 13, Fig. 1, and Appx. A). The mining operation currently encompasses around 1,500 acres. (D. Gibson Depo., DE 137-1, at PageID# 921:23-922:14). The permits for this area were previously held by Pine Branch Coal Sales, Inc., who transferred the permits to Pine Branch in 2013 when it acquired the operation. (Ricci Report, at p. 13, Ex. 1).

### A. The Historic and Unprecedented Nature of the July 2022 Rain Event.

The volume of rain that fell between July 25th and July 30th in eastern Kentucky had never been recorded before. According to Dr. Joshua Durkee, an expert on atmospheric science and meteorology, the amount of rain that fell in the River Caney area was even greater and more concentrated than the rest of the state.  Simply put, the River Caney Watershed was one of the areas that experienced the very worst of this historic natural disaster.

Per the National Weather Service ("NWS"), the unprecedented weather phenomenon was caused by "several complexes of thunderstorms [that] developed south of I-64" between July 25th and the 30th.[10] Heavy rains fell on the 25th and 26th and then once that axis of thunderstorms left the region, another round of heavy storms set in and continued to batter the area.[11]

In all, *twenty-four* Flash Flood Warnings were issued, with thirteen of them being issued late in the evening on July 27th through mid-morning on July 28th, which turned out to be the peak of the rain event:

---

[10] *See https://www.weather.gov/jkl/July2022Flooding*

[11] *Id.*



Flash Flood Warnings issued by NWS Jackson, KY from July 26th through July 30th, 2022. **Three of these warnings were "Flash Flood Emergencies."** This type of Flash Flood Warning is reserved for catastrophic flash flooding events.

(Durkee Report, at p. 3, Ex. 3). As explained by the Defendants' expert, Dr. Durkee, three of the thirteen warnings were upgraded to Flash Flood Emergencies, a warning which is reserved for the most severe of storms and only "when a flood threat poses immediate danger to life and catastrophic damage." (Id. at p. 3). The warning issued to southern Breathitt and northern Perry Counties, where River Caney is located, was a Flash Flood Emergency. (Id.).

According to the NWS-Jackson Office, the River Caney area received over ten inches of rain during the July 25th - 30th storm event, surpassing the torrential amounts of rain seen in the surrounding areas:



Estimated rainfall totals from July 25th through July 30th, 2022 via NCEP Stage IV precipitation data.

(Id.).

6

This weather event was record-breaking. Based on data from the Midwestern Regional Climate Center, River Caney is in a zone that received more than *750% of normal rainfall levels*:



(Id. at pp. 4-6 and Fig. 3). As noted by Dr. Durkee, these figures are completely "anomalous," with the NWS Jackson station's, just north of River Caney, recording data for July 2022 that ranks #1 for the most precipitation recorded for any month and with July 27th and 28th specifically ranking #1 and #2, for the most 2-day precipitation totals. (Id.).[12] This astonishing amount of rain "in such a short period of time would overwhelm any area" and the fact is "River Caney experienced more rainfall than the rest of eastern Kentucky." (Id. at p. 6).

### B.  *The Plaintiffs' Allegations and their Failure of Proof in Support of Wrongdoing.*

Plaintiffs do not dispute that the "rain event alleged in the[ir] Complaint was a 1000-year frequency storm." (Plfs. Resp. to RFA, Ex. 4). Nevertheless, Plaintiffs contend that Defendants should be held responsible for their flood damage. (DE 70). Their argument is that Defendants negligently constructed and maintained sediment control structures (i.e. ponds) and failed to reclaim disturbed mining areas in violation of certain mining regulations. (DE 139).

---

[12] The data collected spans the years 1981 through 2024. Data for July 27th through 31st also broke records for 3, 4, and 5-day precipitation totals as well. (Durkee Report, at p. 4, Ex. 3)

However, Plaintiffs have no proof to substantiate their claims. As discussed herein, Plaintiffs only have conjecture, hearsay, and utterly false claims about the actions of Pine Branch. For example, despite Plaintiffs' claims of regulatory violations, the Cabinet did not issue NNCs to Pine Branch for the majority of regulations that Plaintiffs rely upon to support their claim of negligence per se. These include:[13] violation of 405 KAR 16:020 (build-up of sediment in ponds), 405 KAR 16:090 (run-off storage volume requirements for ponds), 405 KAR 16:070 (drainage to pass through sediment ponds), 405 KAR 16:200 (revegetation), 405 KAR 20:060 (placement of materials on the downslope). Since Pine Branch never received NNCs for these alleged violations, the Cabinet never issued Final Orders finding that they occurred, meaning that they cannot serve as a basis for Plaintiffs' negligence per se claims.

And with respect to two NNCs issued for failure to eliminate highwall under 405 KAR 16:020, those NNCs show only that Pine Branch needed additional time to fully reclaim the identified highwall under the regulation.[14] (D. Wilson Depo., DE 136-1, at Page ID# 795:22-796:9). Nevertheless, the Cabinet granted Pine Branch additional time to complete this reclamation,[15] an extension that the Cabinet cannot legally grant if Pine Branch had shown any "lack of diligence" in its reclamation obligations. 405 KAR 12:020 Section 2(4); *see also* (Agreed Order, Ex. 2). There is no evidence to even insinuate that Pine Branch breached the timeline established in the Agreed Order, let alone an actual allegation by the Cabinet of a breach. Instead,

---

[13] On page 5 of their Motion, Plaintiffs also reference 405 KAR 16:030, related to "signs and markers", but provide no analysis as to how they contend this regulation was violated. (DE 139, p. 5).

[14] Plaintiffs claim there were "copious" and "voluminous" NNCs written on this issue. (DE 139, pp. 11, 13). In reality, there were only two. The "copious" and "voluminous" documents Plaintiffs reference are merely follow-up inspection reports relating to those two NNCs, No. 80-0845 and 80-0847. (DE 139-1, at PageID# 1110-1123 and 1126-1139).

[15] Had this timing issue actually presented a dangerous condition, the Cabinet would have been legally obligated to issue a cessation order ("CO") "which would shut everything down immediately," instead of granting an extension of time. (D. Wilson Depo., DE 136-1, at 825:13-826:10); 405 KAR 12:020 Section 3(1)(b)(1).

it was the testimony of Cabinet inspector Daniel Wilson that the Agreed Order set a new deadline for completion of the reclamation and Pine Branch is diligently working toward that deadline. (D. Wilson Depo., DE 136-1, at PageID# 827:3-24).

### C.   The Plaintiffs' Lack of Proof in Support of Causation.

Irrespective of whether there has been a violation of any standard of care, and there has not, Plaintiffs have no evidence to support their contention that Defendants caused or contributed to the flooding or their damages – an issue that Plaintiffs fail to even address in their Motion.

During discovery, Plaintiffs uniformly denied having any personal knowledge of Defendants' coal mining activities or how they caused their damages. Through their depositions, each testified that they blame the "coal company" for their damages based, not on scientific proof, but instead rumors and speculation. *See, e.g.,* (B. Craft Depo. at p. 78:13-18, B. Fugate Depo. at p. 161:20-25, E. Henson Depo. at p. 193:12-194:7, S. White Depo. at p. 145:18-23, F. White Depo. at p. 101:9-23, G. White Depo. at p. 108:11-22, and M. White Depo. at p. 73:1-5, at Ex. 5).

Additionally, the Plaintiffs conceded through their written discovery responses that only expert testimony would be competent to show how, if at all, Defendants' mining activities caused or contributed to the flooding. When asked to describe the "complete basis" for their claims, their response was that they intended to rely on a "report from Dr. Scott Simonton" and that they "have been advised that Dr. Scott Simonton is of the opinion that the failure to reclaim and the failure to properly maintain the silt ponds exacerbated the flood event that caused substantial damage." (Resp. to Int. No. 8, Ex. 6).  However, because this Court found that Dr. Simonton's methodology in forming these opinions wholly fails, he has now been excluded as an expert in this case and

Plaintiffs are left with *no proof* on the issue of causation.[16] Plaintiffs cannot establish causation based on their speculation or reliance on an excluded expert. Thus, the Plaintiffs' claims must fail.

### D. *Affirmative Proof that Defendants Did Not Cause or Contribute to the Plaintiffs' Damages.*

The only admissible expert proof as to causation comes from the Defendants' expert hydrologist, Mike Ricci, P.E. Although Defendants bear no burden, and Plaintiffs have failed to meet theirs, Defendants disclosed Mr. Ricci's opinions in order to establish, affirmatively, that their actions did not cause or contribute to the Plaintiffs' damages.[17] Unlike Dr. Simonton, Mr. Ricci did conduct hydrologic modeling, which shows, among other things, that Pine Branch did not cause or exacerbate flooding in River Caney. (Ricci Report, at pp. 20-26, 28, Ex. 1).

Mr. Ricci first constructed a HEC-HMS model in order to determine whether peak volumetric flow into the River Caney hollow was any greater under the conditions that existed in July 2022 than would have been experienced with the same storm event under pre-mining conditions. (Id. at pp. 15, 20-21). The results of the model are striking - the peak flow into River Caney decreased under the conditions that existed in July 2022 as compared to pre-mining conditions *by double-digit percentages*:

---

[16] Plaintiffs are correct that this is the type of case where expert proof on causation is required. In general, "natural hydrologic systems are inherently complex." Hydrologic Modeling Bench Book, at p. 26, available at https://www.judges.org/wp-content/uploads/2020/03/DTW-Hydrologic-Modeling-Benchbook.pdf. The complex terrain, characterized by steep mountains and narrow valleys, as well as dendritic water systems present here only complicates the matter. As this Court noted, the behavior of the hydrologic systems at issue can rarely "be predicted with anything less than a computer-based hydrologic simulation model," necessitating an expert. (DE 134 at p. 5).

[17] Mr. Ricci is a licensed professional engineer with extensive experience with mining, permitting, and hydrologic modeling. (Ricci Report, at Appx. B, Ex. 1).

| Element | July 2022 Storm Event | | |
| | Pre | During | Comparison |
| --- | --- | --- | --- |
| | Peak Discharge (cfs) | | Difference (%) |
| CP-1 | 1,968.8 | 1,571.4 | -20.2% |
| CP-2 | 3,489.2 | 2,411.7 | -30.9% |
| CP-3 | 3,495.1 | 2,418.1 | -30.8% |
| CP-4 | 4,329.5 | 2,883.0 | -33.4% |
| CP-5 | 4,846.9 | 3,313.1 | -31.6% |
| CP-6 | 7,135.7 | 5,474.5 | -23.3% |
| CP-7 | 7,158.7 | 5,494.3 | -23.2% |
| CP-8 | 7,646.3 | 5,857.1 | -23.4% |
| CP-9 | 9,415.1 | 7,878.3 | -16.3% |

(Id. at p. 21 and Table 5). As indicated by Mr. Ricci, the "lower peak flow rates are largely due to the re-establishment of vegetation in much of the mining area and significant reduction in land slopes as a result of surface mining." (Id. at p. 21). Notably, "[t]he average pre-mining land slope within the current footprint of the mining operation was 45.2 percent. The current average land slope within that same footprint is 15.7 percent, approximately 1/3 the steepness as the area in its pre-mining condition. These much lower slopes result in higher times of concentration within the mined watershed, generating lower peak flows." (Id.). The reduction is also attributable to water control structures and other features of the mine site that held water back. (Id. at 21-22).[18]

Mr. Ricci next performed HEC-RAS modeling to compare flood surfaces and depths that would have been seen pre-mining to those that were seen in July 2022 as a result of the storm event. (Id. at pp. 23-24). The results indicate that flood surfaces for the July 2022 event were "within the estimated pre-mining flood surface," meaning that "[m]ining did not expand the footprint of the flood." [19] (Id. at p. 24). Additionally, the HEC-RAS modeling shows that flood

---

[18] Mr. Ricci also ran a model to determine whether peak flows would have increased during a 25-year/24-hour storm event. The results of this model confirmed compliance with sediment pond design regulations and that there was a reduction in peak flows with during mining conditions as compared to pre-mining conditions, just the same as was seen with the 1,000 year event experienced. (Ricci Report, at p. 21, Ex. 1).

[19] Defendants are filing herewith a video of the HEC-RAS modeling simulation. (HEC-RAS Video, Ex. 7). The gray outline on these videos represents the pre-mining flood surface while the blue interposed on top of the gray outline represents the flood surface for during-mining conditions. As the Court can see, the blue during-mining flood surface falls within (and in some areas, falls short) of the gray pre-mining flood surface.

stage depths were generally less under July 2022 conditions as compared to pre-mining conditions. (Id.).

Plaintiffs' failure to put forth any credible evidence of causation alone warrants not only denial of their pending Motion but also grant of summary judgment in favor of the Defendants. The fact that the affirmative proof of record shows that the Defendants decidedly did not cause or contribute to the Plaintiffs' damages makes the grant of summary judgment all the more warranted.

## <u>LEGAL STANDARD</u>

"Summary judgment is proper when, construing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in their favor, there 'is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 602 (6th Cir. 2022). Once a movant meets its burden by showing that "there is an absence of evidence to support the nonmoving party's case," the nonmovant must "produce admissible evidence to create a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Wilson v. Ohio Dep't of Job & Family Servs.*, 178 F. App'x 457, 463 (6th Cir. 2006) (emphasis omitted). "[C]onclusory allegations, speculation, and unsubstantiated assertions" are insufficient "to defeat a well-supported motion for summary judgment." *Smith v. Sumner*, 2023 U.S. Dist. LEXIS 90724, at *33 (E.D. Ky. May 24, 2023).

Plaintiffs have moved for summary judgment on their negligence per se claims. However, the record establishes an absence of proof of violation of the regulations underlying those claims and that Plaintiffs are not within the class of persons intended to be protected by the regulations. *Bell v. Kokosing Indus.*, NO. 19-53-DLB-CJS, 2022 U.S. Dist. LEXIS 58233, at *15 (E.D. Ky. Mar. 29, 2022) (reciting elements of negligence per se claim).

Further, causation is an element of every claim Plaintiffs have pled, including their claims for negligence per se. *See Readnour v. Gibson*, 452 S.W.3d 617, 620 (Ky. App. 2014) (common law negligence); *Stivers v. Ellington*, 140 S.W.3d 599, 601 (Ky. App. 2004) (negligence per se); *Stathers v. Garrard County Bd. of Educ.*, 405 S.W.3d 473, 479 (Ky. App. 2012) (strict liability claims);[20] *Pete v. Anderson*, 413 S.W.3d 291, 304 (Ky. 2013) (wrongful death and loss of consortium) (Noble, J., concurring in part and dissenting in part); KRS 350.421(2) (well water claims). Because there is an absence of any proof supporting causation in this case, not only should Plaintiffs' Motion be denied, but judgment should be granted in favor of the Defendants.

## ARGUMENT

### I.   Plaintiffs Lack any Evidence to Support Causation.

While this brief addresses the fact that Plaintiffs cannot establish a breach of any applicable standard of care below, Defendants address first Plaintiffs' complete inability to prove causation in this case, as any tort claim necessarily fails without causation. Plaintiffs have wholly failed to amass any competent proof that any action or omission on the part of the Defendants caused or contributed to the harm they allege – a necessary prerequisite to proceeding to trial. This, however, is no coincidence given the overwhelming affirmative proof submitted by the Defendants that Pine Branch's mine operations did not cause or contribute to their harm. While Defendants do not

---

[20] Even if Plaintiffs could show causation, their strict liability claims would necessarily fail because they do not allege an ultra-hazardous activity for which defendants could be held liable. *Dickens v. Oxy Vinyls, LP*, 631 F. Supp. 2d 859, 863-64 (W.D. Ky. 2009) (citing S*mith v. Carbide & Chems. Corp.*, 226 S.W.3d 52, 55 (Ky. 2007); *Randall v. Shelton*, 293 S.W.2d 559, 561 (Ky. 1956)). An activity is ultra-hazardous where its "very operation itself is, and is known and recognized to be, inherently dangerous at its inception." *Randall*, 293 S.W.2d at 561. Activities that can be conducted safely and are heavily regulated, such as surface mining, are not ultra-hazardous. *Hahn v. Chevron, U.S.A.*, 60 F.3d 828, 1995 U.S. App. LEXIS 17528, at *5-6 (6th Cir. 1995) (unpublished opinion); *Collins v. Liquid Transporters*, 262 S.W.2d 382, 383 (Ky. 1953); *accord Modern Holdings, LLC v. Corning Inc.*, No.: 13-405-GFVT, 2015 U.S. Dist. LEXIS 41134, at *30 (E.D. Ky. Mar. 31, 2015). Moreover, Kentucky courts have never labeled surface mining as an ultra-hazardous activity, while at least one other jurisdiction has specifically held that it is not one. *In re Flood Litig. Coal River Watershed*, 607 S.E.2d 863, 873-74 (W. Va. 2004).

concede that they violated any standard of care, the evidence of record related to causation establishes that Defendants are entitled to summary judgment.

### A.  Plaintiffs do not have the expert testimony necessary to prove causation.

Plaintiffs conceded through discovery that an expert witness is needed to establish that any action on the part of the Defendants caused or contributed to flooding in River Caney. However, the sole expert they put forth in support of their claims, Dr. Simonton, has been excluded. As a result, Plaintiffs lack the expert proof needed to support any theory of causation.

It is axiomatic that expert testimony is required for "a proper understanding of that which requires scientific or specialized knowledge and which cannot be determined intelligently from testimony on the basis of ordinary knowledge gained in the ordinary affairs of life." *Commonwealth, Dep't of Highways v. Robbins*, 421 S.W.2d 820, 824 (Ky. 1967) (citing *Louisville & N.R. Co. v. Conn*, 200 S.W. 952 (Ky. 1918)); *accord* Fed. R. Evid. 701(c).        As        the National Judicial College's Hydrologic Modeling Bench Book recognizes, in cases where injuries are alleged to have "result[ed] from flooding thought to be caused by [land disturbances like] mining and timbering operations," computer based models are often needed to "prove causation." (Hydrologic Modeling Bench Book, at p. 18). In other words, this is the precise type of case where the issue – causation – is not within the ordinary knowledge of a lay juror and expert testimony is required.

Given the complexity of the science of hydrology, the Sixth Circuit has endorsed the view that "causation of flooding is a complex issue which must be addressed by experts." *Cox v. Tennessee Valley Auth.*, 989 F.2d 499, 1993 U.S. App. LEXIS 5875, at *11 (6th Cir. Mar. 15, 1993) (unpublished table opinion). Other federal and state courts are in accord. *See, e.g., Hendricks v. United States*, 14 Cl. Ct. 143, 149 (Fed. Cl. 1987) (same); *Devonwood-Loch Lomond Lake Ass'n Inc. v. Cty. of Fayetteville*, No. 5:18-CV-270-D, 2021 U.S. Dist. LEXIS 147653, at *12 (E.D.N.C.

Aug. 6, 2021) (same); *Garr v. Cty. of Ottumwa,* 846 N.W.2d 865, 872 (Iowa 2014) ("Courts have found that establishing a causal link between the topographical changes and flooding requires expert testimony"); *Davis v. Cty. of Mebane*, 512 S.E.2d 450, 504-05 (N.C. Ct. App. 1999) ("lay testimony would not be sufficient to explain changes in the watershed or in the downstream water flow").

This reasoning is sensible because it is necessary to consider "before and after", i.e., pre-mining and during-mining, conditions to assess whether a land disturbance caused or contributed to flood damage – an analysis that a typical lay juror is incapable of conducting on their own. *See, e.g.*, *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1363 (Fed. Cir. 2018) ("Here, the plaintiffs failed to present evidence comparing the flood damage that actually occurred to the flood damage that would have occurred if there had been no government action at all."); *Devonwood-Loch Lomond Lake Ass'n Inc.*, 2021 U.S. Dist. LEXIS 147653, at *13 (plaintiff failed to create a genuine issue as to causation when expert did not "compare the actual flood damage with hypothetical flood damage absent the alleged government action."); *see also, e.g., Funderburk v. S.C. Elec. & Gas Co.*, 395 F. Supp. 3d 695, 713 (D.S.C. 2019) (endorsing use of HEC-RAS modeling to compare flooding scenarios with and without an embankment); *Alost v. United States*, 73 Fed. Cl. 480, 493 (Fed. Cl. 2006), *aff'd sub nom. Morgan v. United States*, 254 F. App'x 823 (Fed. Cir. 2007) (endorsing hydrologic modeling to compare pre-condition and post-condition flooding); *Watkins v. Lawrence Cty.*, No. 3:17-cv-00272-KGB, 2020 U.S. Dist. LEXIS 88931, at *13 (E.D. Ark. May 19, 2020) (endorsing use of modeling to compare difference in flooding with and without culvert bridges in place).

Deciding the issue of causation in this case requires complex expert engineering testimony regarding whether or not mining increased water flows into a 3,507 acre watershed. Plaintiffs'

proposed expert on this issue has been excluded. Where, as here, a plaintiff fails to produce competent expert testimony on an issue that requires expert proof, summary judgment is appropriate. *See, e.g., Gregory v. Burnett*, 577 F. App'x 512, 520 (6th Cir. 2014); *Snowden v. Speedway LLC*, NO. 5:18-425-KKC, 2021 U.S. Dist. LEXIS 228192, at *17 (E.D. Ky. Nov. 30, 2021); *Snyder v. Am. Honda Motor Co.*, NO. 6:07-241 KKC, 2009 U.S. Dist. LEXIS 65325, at *18-19 (E.D. Ky. July 28, 2009).[21]

### B.  Defendants did not cause or contribute to Plaintiffs' damages.

Plaintiffs' lack of expert testimony (or any other admissible evidence) on causation alone warrants dismissal of this case. The only competent expert in this case that has conducted the modeling necessary to determine the impact of mining on the July 2022 flood event is Mr. Ricci, a recognized expert in sedimentology, mining, and permitting. His review of this matter, and the modeling that he conducted, establishes that Defendants' mining operations did not cause or contribute to the flooding – further reinforcing that summary judgment is appropriate.

Mr. Ricci's scientific modeling establishes that the flow of flood waters, the surface area of floodwaters, and the depths of flood waters during the July 2022 storm event were all less than what would have been seen under pre-mining conditions. (Ricci Report at pp. 17, 21, 24, Fig. 4 and Table 5, Ex. 1). In other words, if anything, the features of the mine site in July 2022 reduced the flooding in River Caney.

---

[21] Even if expert proof were not required to prove causation in this case, and it is, Plaintiffs have failed to put forth any admissible lay evidence on the topic of causation.  By their own admission, their personal beliefs about the Defendants being the cause of their damages are based on speculation, supposition, rumors and hearsay at best. (Depo. Excerpts, Ex. 5). This is not the "admissible evidence" needed to create a genuine issue of material fact sufficient to overcome summary judgment. *Celotex Corp.*, 477 U.S. at 325. Moreover, Plaintiffs conceded in response to written discovery that Dr. Simonton would provide the "complete basis" to support their claims. (Resp. to Inter. No. 8, Ex. 6).

Judgment has been rendered in favor of defendants in similar flood cases. *Russell Fork Coal Co. v. Hawkins*, 223 S.W.2d 887, 890, 892 (Ky. 1949) (defendant surface mine operator not liable for flood damage to Plaintiffs' downstream land when affirmative evidence of record showed that a storm of "cloudburst proportions" caused the flooding rather than a mining pit that broke and released an inconsequential amount of water); *Fife v. Chesapeake & Ohio Ry. Co.*, 211 S.W.2d 854, 855 (Ky. 1948) (evidence "conclusively establishe[d] that on the night and early morning in question there was an extraordinary rain and a resulting flash flood from which appellant's loss directly resulted . . . and [that] no drain or culvert which appellee was obliged to construct to carry off the waters from a normal rainfall would have carried off the abnormal flood waters which swept the hollow in which appellant lived"); *see also Louisville Hydro-Electric Co. v. Coburn,* 110 S.W.2d 445, 447 (Ky. 1937) (finding, based on expert testimony, that "even a great number of culverts or openings through the dam would not appreciably reduce the height of the water in Shippingport in times of flood"). Although Defendants have no obligation to prove their lack of culpability at summary judgment, Mr. Ricci's analysis does so.

## II.     Plaintiffs Fail to Establish a Violation of Any Standard of Care.

In addition to the fact that Plaintiffs cannot meet their burden to establish causation, a necessary element of every claim, they also cannot establish that Defendants violated several of the regulations that they reference in support of their negligence per se claims. Plaintiffs as well cannot establish that they are within the class of persons intended to be protected by the regulations cited or that their injuries are the type intended to be prevented, additional, necessary elements of a negligence per se claim. *Bell*, 2022 U.S. Dist. LEXIS 58233, at *15; *St. Luke Hosp., Inc. v.*

17

*Straub*, 354 S.W.3d 529, 534-535 (Ky. 2011). For these reasons as well, Plaintiffs' Motion should be denied and judgment should be granted in favor of the Defendants.[22]

### A. An NNC Has Never Been Issued With Respect to Most of the Regulations Cited, Let Alone a Final Order Needed to Establish Violation.

Plaintiffs have failed to establish that any Final Order has been issued by the Cabinet holding that the Defendants have committed a violation of any regulation they cite, a necessary prerequisite to their negligence per se claims. *Vander Boegh v. Bank of Oklahoma,* 394 S.W.3d 917 (Ky. App. 2013).

In *Vander Boegh*, certain trust beneficiaries alleged mismanagement of a trust that owned a limestone quarry because of the trustee's failure to declare a breach of the lease based on violation of Kentucky surface mining regulations. The beneficiaries introduced testimony from a mining engineer that the lessee had breached both its permit and the applicable surface mining regulations by mining outside the permit boundary.[23] Plaintiffs asserted that such regulatory violations constituted breach of the lease. However, no violation was issued by the Cabinet. The Court of Appeals found that the beneficiaries' proof was thus insufficient to establish the existence of a violation and that a Final Order from the Cabinet was needed to prove violation:

> Neither [a third party expert witness], nor the circuit court, have any authority to make an initial determination of a mining permit violation. Rather, pursuant to KRS Chapter 350, only the Energy and Environment Cabinet and its secretary are vested with the power and authority to enforce the Commonwealth's surface mining and reclamation laws, which would necessarily include investigating potential mining

---

[22] Plaintiffs have not set forth any "general" standard of care for the engineering of a mine site that they contend was violated by the Defendants. Instead, their Motion relies only on standards of care they contend are established by certain mining regulations. However, even if they had set forth some common law standard of care, just like their negligence per se claims, that claim too would fail as a matter of law. Plaintiffs do not have any expert who can attest that the Defendants failed to adhere to any engineering standards with respect to the mine site. *Coburn*, 110 S.W.2d at 447 (holding that "only one possessing expert knowledge of the subject c[an] express an intelligent opinion" on a "technical engineering problem").

[23] Limestone (and other "non-coal") mines are subject to regulation as surface mines, but under a different chapter of Title 405 of the Kentucky Administrative Regulations than coal mines. However, the Court of Appeals relied on coal mining cases in deciding this case and the distinction between coal and non-coal mining regulations is not material to the analysis.

permit violations and making the initial determination of whether a violation exists. *See White v. Shepherd*, 940 S.W.2d 909, 911, 44 4 Ky. L. Summary 9 (Ky. App. 1997). Courts, on the other hand, are vested in such proceedings only with the authority to review final orders from the Cabinet on appeal. *Id*.

To put it simply, if a permit violation is to be the basis for a default under the lease, it is axiomatic that there must first be a determination, by the entity authorized to make it, that a permit violation exists. Here, the record is devoid of any determination from the Cabinet that Martin Marietta violated any provision of its mining permit. In the absence of a **final order** to that effect from the Cabinet, the circuit court would have no authority to make such a determination on its own, and there would be no basis for holding Martin Marietta in default in that regard.

*Vander Boegh,* 394 S.W.3d at 930-31(emphasis added). In addition to the fact that the "proof" they cite does not establish an actual violation of any regulation, the Plaintiffs here have also failed to establish that an NNC was issued with respect to the majority of regulations cited, let alone a Final Order, no longer subject to any further appeals, establishing violation.[24]

### i.   405 KAR 16:020 – Related to Clean-Out Levels of Sediment Ponds

As far as 405 KAR 16:020 is concerned, Plaintiffs contend that this regulation requires a mine permittee, like Pine Branch, to ensure that its sediment ponds are continually maintained to comply with the design and performance standards approved in the permit and that sediment "shall be removed" from the ponds "if the design sediment storage volume has filled with sediment." (DE 139, pp. 6-7). Not only do the mine inspection reports cited by Plaintiffs not show a violation of the regulatory standard, the reports do not even relate to mining permits held by Pine Branch in the River Caney watershed. (DE 139-8 and 139-9); (Ricci Report, p. 13, Ex. 1); (D. Wilson Depo., DE 136-1, at PageID# 832:14-833:1) ("FP" notations, such as those regarding sediment ponds found on the ICG mine inspection reports, are preventative maintenance remarks that are not

---

[24] Even if a Final Order is issued by the Cabinet following an administrative hearing, as the court in *Vander Boegh* notes, a litigant could further challenge that order through appeal to the state Circuit Court. This means that even if a "Final Order" from the Cabinet is issued, no final determination as to violation likely exists until all appeals of the Cabinet's "Final Order" are exhausted. In other words, even if the Plaintiffs in this case could show a "Final Order" from the Cabinet, whether the Defendants breached any identified regulation would still be subject to further debate.

indicative of current violations). As far as Pine Branch's ponds located within the watershed are concerned, the permits required sediment removal based on "clean-out" levels[25] and Plaintiffs offer no evidence that the clean-out level was ever reached prior to the July 2022 storm event and no NNC was ever issued related to clean-out.[26] *See* 405 KAR 16:090 Sections 2 and 5(3).

### ii.   *405 KAR 16:090 – Related to Runoff Storage Volume of Sediment Ponds*

Next Plaintiffs allege that Pine Branch's sediment ponds failed to meet standards related to runoff storage volume. Plaintiffs allege violation of 405 KAR 16:090, Section 3(2)(a) requiring that sediment ponds be "designed, constructed, and maintained to . . . (2)(a) Contain the runoff from the ten (10) year, twenty-four (24) hour precipitation event . . ." (DE 139 at p. 7). Plaintiffs cite no violation issued to Pine Branch of this regulation. Instead, they contend that because "fish originating from the bench/silt ponds were displaced all the way to the Plaintiffs' properties" during this storm event and because the sheer velocity of water caused some erosion of the emergency spillway, there must have been a violation. (Id. at pp. 7-8).

Not only do Plaintiffs fail to offer any proof in support of their claim of violation, as Mr. Ricci explains, the cited regulatory design standard is considered met, according to a state Technical Reclamation Memorandum ("TRM"), if a permittee can show that "peak discharge resulting from the 25 year/24 hour storm event for a 'worst case' active mining watershed condition is less than or equal to the 25-year/24 hour peak discharge for the pre-mining watershed

---

[25] Attached hereto is a diagram from Pine Branch's state permit files that illustrates the clean-out elevation in comparison to other elevations within a pond. (Pond 45 Diagram, Ex. 8).

[26] Plaintiffs also appear to conflate this requirement related to clean-out with an NNC for erosion issued by the Cabinet *following the flood event*. An NNC was written related to erosion on the downstream sides of certain sediment ponds after the July 2022 rain event. However, the record demonstrates that this NNC was not issued because of any pre-flood negligence by Pine Branch but instead the erosion that the Cabinet wanted remedied was *caused by* the rain event. (D. Wilson Depo., DE 136-1, at PageID# 827:25-829:13); (Depo. of D. Gibson, DE 137-1, at PageID# 945:9-15). In any event, this NNC does not evidence a failure to meet regulations related to pond clean-out.

condition." (Ricci Report at p. 15, Ex. 1); (TRM #2, Ex. 9) (providing this standard). The HEC-HMS modeling conducted by Mr. Ricci evidences that the ponds would not have "overtopped" during these conditions and peak discharge would be decreased when compared to pre-mining conditions. (Id. at pp. 21, 28). In other words – the design standards were met. (Id.).[27]

### iii. 405 KAR 16:070 – Related to Surface Drainage Passing Through Sediment Ponds

Plaintiffs claim violation of 405 KAR 16:070, which provides that: "(a) All surface drainage from disturbed areas shall be passed through a sedimentation pond or a series of sedimentation ponds before leaving the permit area," but, again, the Cabinet did not issue an NNC for violation of this regulation. Moreover, Plaintiffs contend that because mine inspector Wilson observed "silt and stuff like that" in the River Caney hollow following the 1,000 year flood event, it is conclusively established that drainage did not pass through sedimentation ponds before leaving the permit area. (DE 139 at pp. 8-9). But Plaintiffs offer no evidence that the silt came from the permitted area at all, let alone that design standards for ponds were not met. Instead, the only evidence of record is Mr. Ricci's modeling showing that Pine Branch met the design standards.[28]

### iv. 405 KAR 16:200 – Related to Revegetation

Plaintiffs contend that Defendants failed to carry out revegetation in a "manner that encourages prompt vegetative cover" in compliance with 405 KAR 16:200. To support their contentions, they distort the inspection notes of a Cabinet inspector and the testimony of Pine

---

[27] Additionally, this was not a 25-year/24-hour rain event, and Plaintiffs cannot rationally claim that the water and fish coming out of a pond under the actual conditions of the July 2022 rain event is evidence of a failure to meet the lesser regulatory design storm standard.

[28] Plaintiffs appear to take the untenable position that Defendants are required to go well above and beyond the design standards for ponds and ensure, irrespective of whether or not a natural disaster can be predicted or displacement of material by such a disaster can be prevented, that all materials of any kind be prevented from escaping the permittee's property. This is not the law.

Branch employee Don Gibson. The testimony of these individuals, however, does not support Plaintiffs' theory at all.

While Plaintiffs contend that Mine Inspector Wilson noted a violation of the revegetation standards through indication on mine inspection reports that Pine Branch had not yet reached 90% permanent ground cover by the time of the storm event, that is not what Mr. Wilson testified.  Mr. Wilson stated during his deposition that the notation *was not an indication of a violation* but instead an indication to Pine Branch that eventually 90% revegetation would have to be attained to secure a reclamation bond release from the Cabinet.[29] (D. Wilson Depo., DE 136-1, at PageID# 830:21-831:12) ("Q. You had several that said FP, ninety (90%) percent revegetation. Does that mean that the permittee was in violation of the revegetation standard? A. No. That, all that means is that the post-mining land use was hayland pasture. And in order to achieve bond release, you know, ninety (90%) percent of ground cover is what has to be achieved."). Plaintiffs are also wrong in their assertion that Pine Branch had only attained around 20-25% of the requisite ground coverage at the time of the flood event. (DE 139 at pp. 1, 11). Mr. Gibson clarified that approximately 25% of the permitted area subject to the Agreed Order was "completely reclaimed" as of the July 2022 storm event. (D. Gibson Depo., DE 137-1 at PageID# 930:1-931:4). Mr. Wilson testified that Pine

---

[29] The bonding procedure is an important aspect of surface mine operation and reclamation. Surface mine permittees must post performance bonds as part of their applications for mine permits. 405 KAR 10:015. Once mining is complete on a permit or an increment of a permit, a permittee can apply for bond release. 405 KAR 10:040. The bond release process proceeds in reclamation phases (Phase I, Phase II, and Phase III). 405 KAR 10:040, Section 2(4). A Phase I bond release requires, among other things, the completion of backfilling, grading, and drainage control including soil preparation and initial seeding and mulching. 405 KAR 10:040 Section 2(4)(a). Phase II, on the other hand, requires "revegetation . . . established in accordance with . . . the standards for the success of revegetation, except productivity standards," meaning that there must be 90% ground cover for pastureland, i.e., the postmining land use at issue. 405 KAR 10:040 Section 2(4)(b)(1); 405 KAR 16:200 Section 5(2)(a). In other words, Mr. Wilson (and Plaintiffs) are referencing a standard for a Phase II bond release, which requires an advanced level of revegetation achieved only when a permittee is no longer actively mining. They are not referencing a revegetation standard that Pine Branch's active mining operations could fail to meet.

Branch had completely reclaimed other areas of the permits as well. (D. Wilson Depo., DE 136-1, at PageID# 831:10-832:13).  Inspector Wilson's testimony does not support Plaintiffs' claims.

Moreover, the Google Earth image from *eight years before the flood event* proffered by the Plaintiffs also does not accurately reflect the conditions of the mine site as of July 2022. (DE 139-3). Instead, Mr. Ricci's Report documents considerable reclamation and revegetation progress and photos taken immediately after the rain event evidence anything but a barren "moonscape" as Plaintiffs contend.[30] (Ricci Report at pp. 21, 27, and Appx. A, Ex. 1); (Photo, Ex. 10). And, importantly, the Cabinet did not issue Pine Branch any NNC related to vegetation.

### v.  405 KAR 16:020 – Related to Contemporaneous Reclamation of Highwall

Plaintiffs also cite to 405 KAR 16:020, the regulation that generally requires that reclamation (which includes not only revegetation but also "backfilling, grading, topsoil redistribution, liming, fertilizing, other soil preparation, seeding, planting, and mulching," which in turn involves elimination of highwall) occur "as contemporaneously as practicable with mining operations." (DE 139 at p. 13). While two NNCs related to the time to reclaim open highwall on Pine Branch's permits were issued in the past, extensions of time to reclaim were granted pursuant to 405 KAR 12:020 Section 2(4)[31], which itself provides that the Cabinet cannot grant an extension relating to an NNC if the "failure to meet the time [to carry out the NNC's remedial measures] was

---

[30]Additionally, the Mine Inspection Reports cited by Plaintiffs also evidence considerable reclamation by that time. The Reports document mine acres authorized by a particular permit ("Acres Permitted"), acres subject to a bond ("Acres Bonded"), and the estimated acres that have actually been disturbed by mining ("Est. Acres Disturbed"), with "disturbed" meaning the "ground has been broken" even though those acres "could have been reclaimed" already or "could still be active" for mining operations. (D. Gibson Depo., DE 137-1, at PageID# 940:5-942:7). The Mine Inspection Report for Permit No. 897-0568 dated July 21, 2022 (a week before the flood event) indicates that "Est. Acres Disturbed" on that permit were 2,000, but there is another box indicating that 1,600 acres constitute the "Est. Acres Reclaimed". (DE 136-1, at PageID# 853). Similarly, a July 18, 2022 mine inspection report for Permit No. 897-0569 indicates that there were 1,200 "Est. Acres Disturbed" and 725 "Est. Acres Reclaimed". (DE 136-1, at PageID# 899). In other words, these Reports indicate that an estimated 2,325 of 3,200 disturbed acres (73%) had been reclaimed.

[31] This is the provision under which Pine Branch was granted an extension for time to reclaim highwall, not 405 KAR 16:020 referenced by Plaintiffs. (DE 139 at pp. 11-12).

. . . caused by lack of diligence on the part of the person to whom the notice of noncompliance . . . was issued." 405 KAR 12:020 Section 2(4); *see also* (Agreed Order, ¶6, Ex. 2). Prior to the rain event, the Cabinet agreed to an extension until July 2024 for reclamation of the highwall and there is no indication that Pine Branch was not in compliance with that timeline. (Agreed Order, Ex. 2).

### vi.   405 KAR 20:060 – Related to Spoil Placed on a Steep Slope

Finally, Plaintiffs claim that Defendants violated 405 KAR 20:060, by placing "spoil, waste, debris, and abandoned or disabled equipment" on certain steep slopes. (DE 139 at pp. 13-14); 405 KAR 20:060. However, Plaintiffs offer no proof that any such materials were deliberately placed on a qualifying downslope by Pine Branch or had come to rest on the downslope and were not removed by Pine Branch. Importantly, no NNC was ever issued for violation of this regulation either. As a result, this regulation as well, cannot serve as a basis for a negligence per se claim.

### B.  The Regulations at Issue are Meant to Protect the Environment and Populace at Large, Not the Individual Plaintiffs.

In addition to the fact that Plaintiffs have failed to prove causation or that a Final Order establishing violation was ever entered on the regulations cited, the Plaintiffs have also failed in their burden to establish that they are within the specific group of people intended to be protected by the regulations and that their injuries – resulting from a 1,000 year flood event, are the type intended to be protected by the regulations. *Bell*, 2022 U.S. Dist. LEXIS 58233, at *15.

When a statute or regulation is intended to protect the "general public and environment at large, not specific property owners," individual property owner claimants are not within the category of individuals sought to be protected nor are their injuries within the class of injuries sought to be protected. *Id.* at *15-16. KRS Chapter 350's statement of legislative policy provides just this: "[I]t is the purpose of this chapter to provide such regulation and control of surface coal mining operations as to minimize or prevent injurious effects on *the people and resources of the Commonwealth*." KRS § 350.020 (emphasis added). This broad and generic reference to the

24

populace as a whole and the environment implies that the legislature's intent was broader than protecting specific individuals. *See In re Renfrow*, 112 B.R. 22, 24 (Bankr. W.D. Ky. 1989) ("K.R.S. Chapter 350 was enacted for the environmental welfare of the people and property in the State of Kentucky."); *Dep't for Nat. Res. & Environ. Prot. v. Stearns Coal & Lumber Co.*, 563 S.W.2d 471, 473 (Ky. 1978) ("The legislature determined that unregulated strip mining conducted with no regard for its effect upon the land constitutes a litany of hazards to the environment, resources and the people of the Commonwealth.").

The Eastern District of Kentucky recently held that a waste management statute with a similar stated purpose was "designed to protect the general public and the environment at large, not specific property owners," and therefore could not serve as the basis for a negligence per se claim. *Bell*, 2022 U.S. Dist. LEXIS 58233, at *16. The legislative purpose for the waste management statute at issue was "to provide for the management of solid waste…in a manner that will protect the public health and welfare, prevent the spread of disease and creation of nuisances, conserve our natural resources, and enhance the beauty and quality of our environment." KRS 224.43-010(1). In other words, like the mining regulations at issue, the purpose of the waste management regulation was to protect the environment and citizenry broadly and as such the regulations could not serve as a basis for negligence per se. For this reason too, Plaintiffs' Motion should be denied and judgment should be granted in favor of the Defendants.

## <u>CONCLUSION</u>

WHEREFORE, for the above stated reasons Defendants respectfully request that the Court deny Plaintiffs' Motion and grant summary judgment in favor of the Defendants, dismissing all claims with prejudice.

Respectfully submitted,

*/s/ Grahmn N. Morgan*
Grahmn N. Morgan (KBA #89219)
Kristeena L. Johnson (KBA #94994)
James M. McClure (KBA #99580)
DINSMORE & SHOHL LLP
100 W. Main St., Suite 900
Lexington, KY 40507
T: (859) 425-1000
F: (859) 425-1099
grahmn.morgan@dinsmore.com
kristeena.johnson@dinsmore.com
mac.mcclure@dinsmore.com

Ashley L. Pack (KBA #89013)
707 Virginia St. E, Suite 1300
Charleston, WV 25301
T: (304) 357-0900
F: (304) 357-0919
ashley.pack@dinsmore.com

and

R. Clay Larkin
Dentons Bingham Greenebaum LLP
300 West Vine Street, Suite 1200
Lexington, KY 40507
T: (859) 231-8500
clay.larkin@dentons.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

This is to certify that I electronically served and filed the foregoing with the Clerk of the Court using the CM/ECF system on this 12th day of March, 2024, which will give notice to all parties of record.

*/s/ Grahmn N. Morgan*
*Counsel for Defendants*

26