UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON
CASE NO. 5:22-CV-231-DCR
*"Electronically Filed"*

EUGENE BAKER, et al                                          PLAINTIFFS

v.

BLACKHAWK MINING, LLC
and PINE BRANCH MINING, LLC                                  DEFENDANTS

---

PLAINTIFFS' COMBINED RESPONSE TO DEFENDANTS'
CROSS-MOTION FOR FULL SUMMARY JUDGMENT

---

INTRODUCTION

As this pleading is being filed the Plaintiffs have a pending motion for partial summary judgment as to liability due to the conclusive evidence of the Defendants' failure to reclaim a large strip mining operation in close proximity to the Plaintiffs' properties. The Defendants' motion conveniently overlooked the inspection reports that document the level of what can only be described as a total lack of reclamation efforts.

Instead, the Defendants fixate on the fact that the mining violations they received have not been finally adjudicated. This responsive pleading will demonstrate that the stunning judicial admission by the Defendants' representative that they had reclaimed only 20 to 25% over the more than two years they were first cited completely undermines their motion. (R. 137, Pg. 17, Gibson Deposition).  More importantly, the actual data indicates the level of reclamation was actually 10% and that Gibson's percentages are inaccurate.

These facts, along with the misleading reliance on the impact of the rainfall, will also be discussed below as once again the Defendants' pleading has totally ignored evidence that there

**1**

was significant rainfall after the destruction of the Plaintiffs' property had occurred and after two of the residents were swept away to die.

<u>ARGUMENT</u>

As discussed in Plaintiffs' Motion for Partial Summary Judgment (Hereafter Plaintiffs' MPSJ, R. 139), incorporated herein by reference, the theory under which the Plaintiffs seek recovery is under Per Se Negligence. Under KRS 446.070, when an entity violates a state statute resulting in injury to an individual, that individual may recover "such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."[1] This right to recovery was extended to state regulations by *St. Luke Hospital Inc. v Straub*, so long as "(1) the regulation must be consistent with the enabling legislation and (2) it must apply to the safety of the citizenry."[2] 405 KAR, which governs the operation of mine sites within the state clearly recites its purpose as requiring the promulgation of regulations "establishing performance standards for the protection of *people* or property"[3]. Therefore, violations under 405 KAR that result in injury allow for a right of private recovery under KRS 446.070.

## I.   PLAINTIFFS CLAIMS INHERENTLY ASSERT CAUSATION AND DO NOT REQUIRE AN EXPERT DETERMINATION

Here, the Plaintiffs have no need for an expert to recover under a per se negligence theory, as illustrating that the Defendants have violated their standard of care with regard to safety-oriented regulations resulting in injury to people or property entitles them to private recovery, without any requirement that they use expert fact determinations. The only germane

---

[1] KRS 446.070.

[2] *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 535 (Ky. 2011), See also *McCarty v. Covol Fuels No. 2, LLC*, 476 S.W.3d 224, 228 (Ky. 2015).

[3] 405 KAR 16:001.

determination to be made here is whether Defendants violated state regulations aimed at protecting the public. As was discussed in Plaintiffs' MPSJ and will be recited below, Defendants have clearly done so and therefore the issue of liability and causation for the Plaintiffs' damages is plainly in favor of the Plaintiffs as a matter of law. The purpose of an expert in this matter would be to determine an issue of fact (i.e. the exact impact of Defendants' operations on the July 2022 rainfall event) rather than one of law (i.e. the liability of the Defendants under KRS 446.070) and as such is immaterial in the current Summary Judgment determination.

As will be subsequently discussed, the Defendants' erroneous claims that they did not cause or contribute to the Plaintiffs' damages are both false and inconsequential at the current time. The sheer degree of injury experienced by the Plaintiffs in the current action are of a degree that could not occur without the presence of Defendants' negligence, and forms the basis of the Plaintiffs' negligence per se action. Rather, the determination to be made under KRS 446.070 as extended to state regulations is whether the Defendants' acts or omissions were in violation of a Kentucky state regulation aimed at protecting citizens and whether the Plaintiffs were subsequently injured.

Unfortunately, the negligence at play in the current action extends beyond the Defendants, as the Kentucky Energy and Environment Cabinet (Hereafter Cabinet) was equally responsible for the Plaintiffs' injuries through its failure to enforce its own regulations. As was discussed in Plaintiffs' MPSJ and will be discussed below, the Cabinet was shockingly apathetic to the myriad of dangerous conditions created by the Defendants in the years leading up to the July 2022 flood event, treating the Defendants with astonishing partiality. In the face of such

3

staggering administrative negligence, it now falls to the judiciary to uphold the principles of the Commonwealth and ensure the safety of the citizens of Breathitt County.

### IV. PLAINTIFFS HAVE ADEQUATELY ILLUSTRATED THAT DEFENDANTS HAVE BREACHED THEIR STANDARD OF CARE

In their motion the Defendants claim the Plaintiffs have failed to establish breach of a standard of care by Defendants. The Plaintiffs disagree and assert that the total lack of reclamation conclusively proves a violation of the standard of care. As will be addressed below, the Defendants also make the misleading argument on page 24 of their motion that the regulations are only designed to protect the general public and not private property owners. Is an entire community of nearly 100 persons all similarly injured by the negligent omissions of a corporate mining entity not the general public?

The Kentucky Supreme Court has clearly addressed the issue as to whether or not the violation of a regulation gives rise to a cause of action and contradicts the Defendants' arguments to the contrary. In *Hargis v Baize* (hereinafter *Hargis*).[4] In *Hargis*, Justice Cooper had a section entitled " Violation of administrative regulation".  In his holding Justice Cooper explained that KRS 446.070 creates a private right of action to individuals damaged by the violation of a regulation or statute provided there is no civil remedy contained in the regulation or statute. In the instant case the Plaintiffs have specifically referenced the mining regulations that were clearly violated. None of those regulations provide a civil remedy.  Hence, the holding of Hargis is controlling. In explaining the ruling of the Supreme Court, Justice Cooper held that violations of statutory regulations constitute negligence per se and can form the basis of liability.

---

[4] *Hargis v Baize,* 168 SW 3rd 36 (2005).

In Hargis there was an allegation that the failure to bind logs was the violation of a safety regulation. The Kentucky Supreme Court reversed a dismissal of the litigation and ordered that a judgment of civil liability be imposed and that a partial judgment of civil liability be imposed. The same logic of Hargis applies here.

As discussed in this brief and elsewhere in the pleadings it is demonstrably fact that the Defendants violated numerous mining regulations having to do with surface mining reclamation obligations. As pointed out in the Plaintiffs' MPSJ, the regulations as to simultaneous reclamation are specifically designed and enacted to prevent the damages that occurred in the instant case.

### A.  THE DEFENDANTS' ARGUMENT THAT THEY ARE FREE OF LIABILITY BECAUSE NO NOTICES OF NON-COMPLIANCE WERE ISSUED IS IN BAD-FAITH

Throughout their Summary Judgment motion (R. 142), Defendants erroneously assert that because no Notices of Non-Compliance were issued regarding multiple alleged violations of KAR Regulations, the Plaintiffs are barred from claiming any negligence on their part. This is flatly wrong and ignores the plain reality of the situation. As discussed in the Plaintiffs' MPSJ, the Kentucky Energy and Environment Cabinet was equally negligent in failing to properly cite the Defendants. No real enforcement occurred. Looking to the record, it is clear that the Cabinet had little to no interest in enforcing the rigors of 405 KAR, as the Cabinet was in no rush to see the reclamation completed, even where the inactivity allowed dangerous conditions to develop and persist until they became deadly during the July 2022 flood event.[5] To claim that the lack of

---

[5] See R 117 Wilson Dep. Exhibit 1,4, See R 137 Gibson Dep. 16:23-17:4, 17:7, See also R 117 Wilson Dep. Exhibit 2, See also R 117 Wilson Dep. 32:5-32:8.

NNCs relating to pond maintenance/reclamation somehow protects them from legal recourse serves as yet another example of the Defendants aiming to benefit from the laxity of the Cabinet.

On December 13 2023, Cabinet Inspector Daniel Wilson was deposed and a number of pertinent notices were entered as exhibits. The first 12 notices were "Inspection of Non-Compliances" (Hereinafter INC's) which all refer to "Contemporaneous Reclamation- KAR-16:020". (R. 138).

Chronologically, the first INC was issued on February 26, 2020. The last one was issued July 21, 2022, or days before the flood event. In all 12 notices there are repeated requests that "more time is needed to complete the required remedial measures". This went on for more than two years with zero evidence that any effort was attempted to complete any remedial measures.

This indifference is confirmed by the remainder of the exhibits attached to the Wilson deposition. The most incriminating is attached as exhibit 2. It is a Mine Inspection Report dated July 21, 2022: once again, days before the flood event.

The Mine Inspection Report references "Contemporaneous Reclamation" with the designation "ER". Wilson explained on page 17 of his deposition that "ER" stands for extension requested. (R. 117)

On the top of the Mine Inspection Report for permit number 897-0568 is a listing of the total acres bonded and the estimated acres disturbed. As of July 21, 2022 or days before the flood event, the listed number for Acres bonded was 2207.02. The listed number for Est. Acres Disturbed was 2000. This computes to about 10 % reclamation. It also casts doubt on the testimony of company representative Gibson who spoke of 20 to 25 percent reclamation. (R. 117, Pg. 17).

Exhibit 3 to the Wilson deposition (R. 138-3) lists identical numbers as to acres disturbed as of September 1, 2022.  In other words, before and after the flood event the level of reclamation was abysmally low.

Similar Mine Inspection Reports for an adjoining permit (897-0569) referenced in exhibit 4 of the Wilson deposition (R. 138-4) also indicate a total lack of reclamation. On March 25, 2021 the number listed for acres bonded was 1,256.73. The number listed for acres disturbed is 1,200. This level of reclamation is even lower than the level listed in permit number 897-0568. Identical numbers were listed on a Mine Inspection Report dated September 1, 2022, or about a month after the flood event. (see collective exhibit 2 to Wilson's deposition, R. 138-2).

A factfinder could easily look at these numbers and conclude the Defendants flagrantly ignored their obligation to reclaim for years. Inspector Wilson was asked about the 90% ground cover standards for vegetation. On pages 32-34 of his deposition (R. 117) when asked whether the ground cover standards from November 29 , 2021 through March 24, 2022 had been achieved - Wilson said they had not. In fact, he later testified, on page 35,  that as of a week before the flood event the permanent ground cover standard had not been achieved.

Plaintiffs agree with Defendants that most violations of 405 KAR asserted lack NNCs but Plaintiffs recognize that in all likelihood, no NNCs would *ever* have been issued regardless of severity of  violations present. As discussed in the Plaintiffs' MPSJ, the negligence of the Defendants had created dangerous conditions relating to each regulation asserted, but no NNCs were ever issued, despite the staggering length of time that some conditions had been allowed to persist. However, even had the Cabinet issued NNCs for many of these conditions, it is clear they wouldn't have spurred any action from the Defendants as the NNCs issued regarding the

lack of reclamation on a site highwall were subject to years of extensions and exemptions on the flimsy basis that the Defendants "needed more time".[6]

Simply put, the Cabinet shares the blame for the tragedy that befell the Plaintiffs, perhaps more than the Defendants, but the assertion that the lack of enforcement from the Cabinet absolves the Defendants from any liability is a bad-faith effort to mask criminal negligence under the shroud of administrative negligence and is intolerable under the law of the Commonwealth.

### B. PLAINTIFFS' CLAIMS RELATING TO SILT/BENCH POND MAINTENANCE ARE SUPPORTED BY THE RECORD

As discussed in Plaintiffs' MPSJ, Defendants have clearly contravened the core purpose of this regulation. Here, the Defendants erroneously assert that they are blameless because no NNC was issued on their bench/silt ponds prior to the flood event, knowing fully that no such thing would have happened regardless of their culpability. As stated, the ponds at issue in this matter were recorded as having buildup of vegetation and woody debris a mere 2 weeks before the flood event.[7] Naturally, the ponds' ability to retain water diminishes as debris and detritus fill it, creating a condition in which they are vulnerable to heavy rainfall. Despite this, no subsequent inspections of the ponds were undertaken until nearly 3 weeks *after* the flood event, where it was found that water had flowed through the pond with such force of current to carve "rills and gullies" in the hillside below.[8] This force of water had been powerful enough to displace fish and silt from the ponds all the way to the Plaintiffs' properties, indicating that the ponds had done little to stymie the rainwater flow.[9]

---

[6] R 117 Wilson Dep. 32:7-32:8
[7] Mine Inspection Report 813-0410.
[8]  R 117 Wilson Dep. 24:24-25:2.
[9] R 137 Gibson Dep. 35:11-35:12.

8

There is little doubt that these fish originated from the silt ponds as Mr. Gibson, in his capacity as a company representative, acknowledged the presence of goldfish in the silt ponds, and similarly acknowledged that the distinctive fish found on Plaintiffs' properties could logically be assumed to have come from "one or more of the ponds."[10] Likewise, the collection of silt and sediment is the primary purpose of the ponds in question, as silt and other sedimentary detritus are common in areas in which the soil has been greatly disturbed (such as the mine site here) and is the likely purpose of their presence at the Caney/Lost Creek mine site.[11]

Defendants are correct that no NNC was issued relating to the clean-out of these ponds prior to the flood event, as no one bothered to inspect them subsequent to the notice issued 7/13/22 which allowed the dangerous conditions to persist in contravention of the purpose of 405 KAR 16:020, 16:090, and 16:070.

### C. PLAINTIFFS' CLAIMS RELATING TO REVEGETATION ARE SUPPORTED BY THE RECORD

As Plaintiffs' MPSJ discussed, the Defendants' failure to adhere to the regulatory standards regarding mine site reclamation/revegetation in this matter has resulted in grave injury to the Plaintiffs. R.139

Looking to the record, Defendants have clearly violated 405 KAR 20:060. Per the testimony of Inspector Wilson, not only had silt and debris flowed downslope from the mine site, but had reached the private property of the Plaintiffs in such quantities that heavy equipment was required to clear it.[12] 405 KAR 20:060 holds that it is the duty of a permittee to prevent spoil, waste, debris, or abandoned equipment from being placed or allowed to remain on a downslope.

---

[10] R 137 Gibson Dep. 34:7, R 137 Gibson Dep. 35:11-35:12.
[11] https://udfcd.org/wp-content/uploads/2014/07/SC-07-Sediment-Basin.pdf (On the purpose of Sediment Ponds).
[12] R 117 Wilson Dep. 5:25-6:2, 6:5-6:6.

The contention of the Defendants that they would have to "deliberately" place or fail to remove waste or debris on the downslope is misleading, as the regulation is not exclusionary as this misrepresentation would imply, but instead confers a duty on the permittee to prevent these items on the downslope. The presence of both distinctive fish from the silt ponds and silt/sedimentary detritus collected by such flowing downslope into non-permitted areas inherently contravenes the clear intention of this regulation in preventing runoff from permittee mine sites downslope into non-permitted areas.

Much like the violations asserted above, no NNCs were issued for Defendants negligence regarding 405 KAR 16:200 or 20:060, whether through a lack of inspection or enforcement. However, NNCs were issued regarding 405 KAR 16:020's contemporaneous reclamation of Highwalls requirements. Unfortunately, as discussed in Plaintiffs' MPSJ and above, the issuance of these NNCs did not spur the Defendants into rectifying the violation, as the Defendants instead spent the following 3 years repeatedly seeking extensions and exceptions to this reclamation timeframe, which were granted repeatedly by the Cabinet, despite the Defendants making little to no progress despite having years to do so. As discussed, the Cabinet is largely culpable for the damage befalling the Plaintiffs, and this is most clearly exhibited through these endless extensions in the face of violation. According to the Defendants' motion for Summary Judgment, the Cabinet cannot grant an extension relating to an NNC if "failure to meet the time [to carry out the NNC's remedial measures] was…caused by a lack of diligence on the part of the person to whom notice of noncompliance…was issued"[13]. Therefore, they erroneously posit, there is no way they could be liable for these asserted violations. However, this line of argument presupposes that the Cabinet was not itself negligent in enforcing its own regulations, which is

---

[13] Defendants' Consolidated response and Cross-Motion for Full Summary Judgment at 23-24

sadly not the case. From the time of the first NNC Inspection of record in December 2019 until July 2022 (a staggering 2.5 years), Defendants failed to correct the violation cited and simply recycled the same vague excuses for non-compliance.

Under the standard above, this practice is indicative of a lack of diligence under 405 KAR 16:200 and by all accounts should have been grounds for a refusal of extension by the cabinet under the principles recited by the Defendants above. However, these extensions were granted every single time without any additional oversight or scrutiny. One would be hard-pressed to even define this period as a "timeline" as it appeared as though it would have continued to extend indefinitely if not for the flood event.

The assertions of the Defendants that they are free from liability simply because no NNCs were issued regarding compliance with this timeline is dishonest at best, as they are fully aware that the Cabinet, through its own negligence, would likely ***never*** have issued any violations. This is especially likely considering that, in exchange for a bond of $505,000 the compliance deadline was extended until July 2024, a shockingly generous 2-year extension following the total 2.5 years already granted. Clearly, The Cabinet was content to grant the Defendants any number of extensions or exceptions to their duty to reclaim, without regard to the dangerous conditions their glacial progress allowed to persist. Therefore, to claim that the lack of NNCs relating to the reclamation timeframe excuses the Defendants from legal reproach for the terrible injury to the Plaintiffs is a duplicitous attempt to take advantage of the tragically lax Cabinet practices to justify their clear violations of their regulatory standard of care.

## V.  THE DEFENDANT' REFERENCES TO RAINFALL ARE MISLEADING

It is also significant to point out that the defendant's references to the historic rainfall is misplaced. It is a question of fact as to how much rain fell after the damage was done. The

plaintiffs take the position that any rain that fell after the damage was done, or after the houses and bodies floated away is irrelevant. In the record is the video and affidavit of Monica Fugate. R119 Her recollections clearly support an inference that much of the rain fell after the destruction. Fugate and others in their testimony report running for their lives and it continued to rain after the destruction had occurred. In her affidavit Monica Fugate stated at 12:30 am,a deluge of rapidly moving water approached her home and forced her to abandon her home and stay outside. Ms. Fugate stated that from 12:30 am until 2:30 in the morning that some of the heaviest rain fell.[14]

## VI. THE DEFENDANTS' INTERPRETATION OF LEGISLATIVE POLICY IS OVERLY NARROW AND MISLEADING

The Defendants erroneously rely on *In Re Renfrow* (a bankruptcy case from a Western Kentucky District, 1989) and *Dept. for Nat. Resources and Envtl. Protec. v. Stearns Coal & Lumber Co* (a permitting review case contemplating the takings clause, 1978) for their interpretations on the legislative intent behind KRS 350, arguing that the statutory intent is too broad to apply to private citizens.[15] In addition to being outdated and off-base comparisons, these cases do not consider the intent of the legislature in applying KRS 350 to situations like that at hand: the district court of *In Re Renfrow* analyzed KRS in the context of whether the statute allowed for the discharge of civil penalties levied upon a chapter 7 debtor in a matter wholly unrelated to any issue concerning the present matter.[16] The *Renfrow* court barely touched on this determination of legislative intent, merely using it as a means to classify its applicability to

---

[14] Paragraphs 4-7 Fugate affidavit.
[15] *In re Renfrow*, 112 B.R. 22 (Bankr. W.D. Ky. 1989), *Dept. for Nat. Resources and Envtl. Protec. v. Stearns Coal & Lumber Co.*, 563 S.W.2d 471, 473 (Ky. 1978).
[16] *In re Renfrow* at 22, 24.

pecuniary discharge if civil penalties.[17] The claims of the Defendants that this entirely separate analysis of KRS 350 is applicable to the current matter is a bad-faith attempt to mislead and confuse the court. Likewise, the court in *Stearns* simply used a broad definition of KRS 350 as an illustrative means to explain why the statute was drafted, with specific focus on the environmental impacts of unregulated mining practices.[18] To assert that this intentionally vague definition is binding in the current matter is a knowing attempt by the Defendants to take the words of the Kentucky Supreme Court out of context and should be disregarded.

For much of their further argument on this point, Defendants rely on *Bell v. Kokosing Indus., Inc*., mistakenly asserting that the *Bell* fact pattern closely resembles that of the current matter, ignoring glaring differences to argue that the plaintiffs in this matter are not meant to be protected by KRS 350 nor are their injuries of the character .[19] Firstly, the contention that the Bells' injuries affecting just 2 citizens is equivalent to the near 100 affected persons in the current matter is flatly dishonest and attempts to discredit the sheer degree of injury suffered here. Second, the waste management statute at issue in *Bell* is wholly unrelated to KRS 446.070, which is the basis of the current action, and as such the legislative intent behind its enactment is naturally different as the two statutes govern two entirely different sectors of the Commonwealth, with that of *Bell* governing the disposal of hazardous waste and KRS 446.070 governing the extraction practices of coal through surface mining. These two sectors are inherently different, both in their operation and the risks of their mismanagement. Hazardous waste produced through improper waste management is naturally a danger to the public health, as beyond being a public nuisance if improperly stored, such waste can pose a tangible threat to

---

[17] *Id.*
[18] *Dept. for Nat. Resources and Envtl. Protec. v. Stearns Coal & Lumber Co.*, 471, 473.
[19] *Bell v. Kokosing Indus., Inc*., No. CV 19-53-DLB-CJS, 2020 WL 4210701 (E.D. Ky. July 22, 2020).

the health of a community through the transmission of diseases or other negative health effects. This is doubly so in cases wherein there is a hazardous waste spill that goes unreported, as in *Bell*, where the hazard risks wide-spread contamination of toxic materials throughout the populace.[20] Surface Mining operations, on the other hand, lack this viral, exponential factor and as a result their harm is much more focused among fewer injured parties. Therefore, one cannot directly compare these two statutes on grounds of breadth of purpose relating to injured parties. Likewise, while the Plaintiffs in *Bell* suffered injuries not directly addressed in the applicable statute, it is obvious that flood damage resulting from improper reclamation of a mine site is well within the purview of KRS 350's legislative intent, especially when considering the amount of subsections dealing directly with post-mining hydrologic balance and rainwater runoff.[21] Therefore, the injuries suffered by the Plaintiffs here are of the type KRS 350 is intended to prevent.

The Defendants' assertions on this point beg a key question: when exactly can mining corporations be held liable for their negligence? What number of innocent, unaffiliated citizens need to be injured before they gain the lofty title of "people of the commonwealth"? According to the Defendants, nearly 100 people composing an entire community all similarly injured by corporate negligence is somehow undeserving of this title. What then is the purpose of these regulations if serious injury must befall a massive yet undefined swathe of the state's citizens before legal reproach is allowed to be contemplated? The arguments of the Defendants to this end border on lunacy and seek to buck the entire purpose of 405 KAR. Here, the Defendants

---

[20] *Bell v. Kokosing Indus., Inc.,* at 25.

[21] See KRS 350.405, KRS 350.410, KRS 350.420.

hope to confuse and mislead the judiciary by asserting an overly-narrow interpretation of the intent of KRS 350 which conveniently excludes any conceivable claimants from ever pursuing recovery for the backhanded reason that the Defendants didn't injure *every citizen* of the Commonwealth. This misrepresentation is a misleading attempt to escape liability for the very serious harm the Defendants caused.

The defendants in this case are likely not the only surface mining operation who ignore their duty to reclaim. This is easily explainable by the lack of enforcement of the Cabinet. The question then becomes when will the next unreclaimed strip mining cause death and destruction? It is clear that if this litigation becomes precedent- it will happen sooner rather than later.

## <u>CONCLUSION</u>

**WHEREFORE**, for the above stated reasons, Plaintiffs respectfully request that the Defendants' motion for Summary Judgment be **DENIED** and that Plaintiffs' motion for Partial Summary Judgment be **GRANTED.**

RESPECTFULLY SUBMITTED,

s:/ Ned Pillersdorf
NED PILLERSDORF
PILLERSDORF LAW OFFICES
124 WEST COURT STREET
PRESTONSBURG, KENTUCKY 41653
PH: (606) 886-6090
FX: (606) 886-6148
Email: pillersn@gmail.com

S:/Darrell Herald
DARRELL HERALD
1140 MAIN STREET
JACKSON, KY  41339
PH: (606) 666-7794
dah41339@yahoo.com

CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document was served via electronic delivery to the Clerk, United States District Court, by using the CM/ECF system on this 1st day of April 2024.

s:/ Ned Pillersdorf
NED PILLERSDORF