UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| EUGENE BAKER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5: 22-231-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| BLACKHAWK MINING, LLC, et al., | ) | **MEMORANDUM ORDER** |
| | ) | **AND OPINION** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiff Eugene Baker, and others similarly situated, have moved for partial summary judgment against Defendant Pine Branch Mining, LLC ("Pine Branch).[1]  They argue that the Pine Branch's surface mining operations caused the damage they experienced amid record flooding and argue the company's conduct constitutes negligence *per se* under Kentucky law. In response, Pine Branch filed a cross motion for summary judgment based on the plaintiffs' lack evidence to prove causation in support of their negligence claims.  Following careful review, the plaintiffs' motion will be denied.  Pine Branch's motion will be granted.

## I.    Background

Pine Branch maintains operations in Breathitt County, Kentucky.[2]  Between July 25 and July 30, 2022, parts of eastern Kentucky experienced historic levels of rainfall that led to

---

[1]      Defendant Blackhawk Mining, LLC, was dismissed after the Court determined that it is merely an upstream parent company of Pine Branch Mining, LLC.

[2]      The Permit Numbers for the mines at issue in the River Caney Watershed are identified as 897-0568 and 897-0569.

"one of the most significant, deadly floods" in the Commonwealth's history.[3]   Disaster declarations by both the federal and state governments were issued for almost the entire region as a result.[4]   Tragically, the floods resulted in significant damage to real property and the loss of human life.

The plaintiffs own property that experienced damage from the flooding in the River Caney Watershed in Breathitt County.[5]   The 3,507-acre drainage area that makes up the watershed is comprised of steep, forested mountains and narrow valleys.   River Caney is in the southernmost part of Breathitt County.   It runs for approximately three miles until meeting the Kentucky River.   The property owners who experienced damage resided near River Caney, which is situated downstream from Pine Branch's surface mining operation known as Comb's Branch in the southeastern portion of the watershed.

---

[3]   Steve Almasy, Jason Hanna and Michelle Watson, *At least 8 dead in eastern Kentucky flooding, and 'hundreds will lose their homes,' governor says*, CNN (July 29, 2022), *available at* https://www.cnn.com/2022/07/28/weather/kentucky-flash-flooding/index.html (last visited May 10, 2024).

[4]   *See, e.g.,* President Joseph R. Biden, Jr. Approves Major Disaster Declaration for Kentucky, available at https://www.fema.gov/press-release/20220729/president-joseph-r-biden-jr-approves-major-disaster-declarationkentucky; Gov. Beshear Declares State of Emergency Due to Severe Flooding in Eastern Kentucky, available at https://governor.ky.gov/attachments/20220728_State_of_Emergency_Eastern_Kentucky_Flooding.pdf.

[5]   Pine Branch operates the "Combs Branch" surface mine, which intersects both Breathitt and Perry Counties.   Although the site was originally permitted by Pine Branch Coal Sales Inc., the predecessor owner of the site, the permits are now exclusively held by Pine Branch. Plaintiffs live below the operation in a hollow within the River Caney watershed near Lost Creek, Kentucky.

The River Caney Watershed experienced some of the heaviest rainfall in eastern Kentucky during the flooding event.[6]   The National Weather Service in Jackson issued multiple Flash Flood Emergencies for Breathitt and Perry Counties as the torrential rain quickly fell, a warning reserved for the most severe storms where flooding poses immediate danger to property and human life.

The plaintiffs filed this action about a month after the floods ravaged the region, alleging that the Pine Branch's mining activities increased storm water into the watershed during the historic rainfall.  They argue that Pine Branch caused or exacerbated the damage experienced from the flooding by failing to safely operate surface mining operations at Combs Branch pursuant to rules and regulations promulgated by Kentucky.  As such, they contend that Pine Branch "knew that the mining and standard of care violations [constituted] ticking time bombs ready to explode with any type of heavy rainfall."   [Record No. 1] More specifically, the plaintiffs claim that Pine Branch's negligence resulted in worsened property damage during the flood, including the loss of their residences, vehicles, and other personal belongings, and caused them to suffer emotional distress.

Based on the theory that the alleged violations constitute negligence *per se*, the plaintiffs have moved for partial summary judgment.  In response, Pine Branch moved for summary judgment, arguing that the plaintiffs have failed to established a causal link between its mining operations and the damage they experienced.  Based on this evidentiary deficiency, Pine Branch argues it is entitled to judgment as a matter of law.

---

[6]      Nat'l Weather Serv., *Historic July 26th-July30th, 2022 Eastern Kentucky Flooding*, available at https://www.weather.gov/jkl/July2022Flooding.

## II.    Legal Standard

Summary judgment is appropriate "when, construing the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in their favor, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 602 (6th Cir. 2022).  A party moving for summary judgment must establish that, even viewing the record in the light most favorable to the nonmovant, there is no genuine dispute as to any material fact and that the party is entitled to a judgment as a matter of law.  *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014).

The burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).  To defeat a properly supported motion for summary judgment, the party opposing it may not "rest upon mere allegation or denials of his pleading" but must present affirmative evidence supporting the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986). If a "rational factfinder could not find for the nonmoving party, summary judgment is appropriate." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

## III.    Law and Analysis

### A.  Standards of Care

The plaintiffs' claims share the common allegation that Pine Branch failed to meet the appropriate standards of care for maintaining its mining operations in Breathitt County as required by Kentucky laws and regulations before the flooding event.  Based on the company's failure to properly maintain its sediment ponds and its incomplete reclamation after surface

mining, the plaintiffs argue that Pine Branch negligently caused or exacerbated the damage they experienced during the flood.

As a general matter, a negligence claim under Kentucky law requires proof of: (1) a duty of care owed by the defendant to the plaintiff; (2) breach of that duty; (3) injury to the plaintiff; and (4) legal causation between the defendant's breach and the plaintiff's injury. *See Steelvest, Inc. v. Scansteel Service Center*, 807 S.W.2d 476 (Ky. 1991). "Duty, the first element, presents a question of law. . . Breach and injury, are questions of fact for the [factfinder] to decide. . . The last element, legal causation, presents a mixed question of law and fact." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88-89 (Ky. 2003). "The standard of care applicable to a common-law negligence action is that of ordinary care—that is, such care as a reasonably prudent person would exercise under the circumstances." *Wright v. House of Imps., Inc.*, 381 S.W.3d 209, 213 (Ky. 2012).

The plaintiffs claim that Pine Branch negligently constructed and maintained sediment control ponds and failed to reclaim disturbed surface mining areas, resulting in violations that expose the company to liability. Thus, they argue that the company's actions constitute negligent *per se* based on their violating multiple mining statutes and regulations. Negligence *per se* refers to a negligence claim in which a statutory standard of care replaces a traditional common law standard. *See Pile v. City of Brandenburg*, 215 S.W.2d 36, 41 (Ky. 2005). Kentucky law provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." Ky. Rev. Stat. § 446.070. This statute creates a private right of action for an individual damaged by a violation of any *statute* that is both penal

in nature and provides no civil remedy if the individual damaged is within the class the statute intended to protect. [7]  *Hargis v. Braize*, 168 S.W.3d 36, 40 (Ky. 2005).

## B.  Alleged Violations of Kentucky Mining Laws and Regulations

Statutory violations are not the only form recognized by Kentucky law under a theory of negligence *per se*.  The Supreme Court of Kentucky has held that a violation of an administrative regulation may constitute negligence *per se* if the rule is consistent with its enabling legislation and protects the public.  *See St. Luke Hosp. Inc., v. Straub*, 354 S.W. 3d 529, 531 (Ky. 2011).  Here, the plaintiffs claim that Pine Branch has violated a series of regulations promulgated by the Energy and Environment Cabinet ("Cabinet") under Title 405 of Kentucky Administrative Regulations.  More to the point, they argue that Pine Branch violated 405 KAR § 16:020 (Contemporaneous Reclamation), 405 KAR § 16:030 (Signs and Markers), 405 KAR § 16:060 (General Hydrologic Requirements), 405 KAR § 16:070 (Water Quality Standards and Effluent Limitations), 405 KAR § 16:090 (Sedimentation Ponds), and 405 KAR § 16:200 (Revegetation).

In addressing this argument, the Court's must first determine whether a violation has occurred under each cited surface mining regulation.  Kentucky provides a specific procedure making this determination.  First, if an inspector believes a company violated a specific authority, he or she issues a Notice of Non-Compliance ("Notice") describing the nature of the perceived violation and any remedial action required.[8]  405 KAR 12:020 Section 2(1)-(2).

---

[7]     Additionally, "[t]he violation of a statute does not necessarily create liability.  The statute must have been specifically intended to prevent the type of occurrence that took place, and the violation must have been a substantial factor in causing the result."  *Hargis*, 168 S.W.3d at 46.  This imposes a causation requirement.

[8]     These are violations pursuant to KRS Chapter 350 or 405 KAR Chapters 7 through 24.

- 6 -

However, the Notice itself is not final because the statutory scheme provides an "opportunity for a hearing" prior to the issuance of a "[F]inal [O]rder." *See* KRS 350.028(4). Following the issuance of a Notice, a permittee may file a petition for review with the Office of Administrative Hearings. KRS 350.0301; 400 KAR 1:110 Section 7; *see also* 400 KAR 1:001(10). Following this hearing, a report and recommended order with findings of fact and conclusions of law is issued. KRS 350.0301(2). The parties may then file exceptions to the hearing officer's report and recommended order. *Id*. The Secretary of the Cabinet next "consider[s] the report, exceptions, and recommended order [to] decide the case." *Id*. The decision of the Secretary of Energy and Environment constitutes a "[F]inal [O]rder of the [C]abinet." *Id*. This Final Order may then be appealed to state court. KRS 350.0305. In the interest of due process, a Final Order is truly considered *final* once all appeals have been exhausted.

Kentucky courts confirm this procedure, holding that a plaintiff must establish that a Final Order has been issued by the Cabinet finding that an aggrieving entity has committed a violation. *See Vander Boegh v. Bank of Oklahoma*, 394 S.W.3d 917 (Ky. App. 2013). In *Vander Boegh*, certain trust beneficiaries alleged mismanagement of a trust that owned a limestone quarry because of the trustee's failure to declare a breach of the lease based on violation of Kentucky surface mining regulations. Trust beneficiaries introduced testimony from a mining engineer that the lessee had breached both its permit and the applicable surface mining regulations by mining outside the permit boundary. The plaintiffs asserted that such regulatory violations constituted a breach of the lease. However, no violation was issued by the Cabinet. As a result, the Court of Appeals observed that a Final Order from the Cabinet was needed to prove violation:

> Neither [a third party expert witness], nor the circuit court, have any authority to make an initial determination of a mining permit violation. Rather, pursuant to KRS Chapter 350, **only the Energy and Environment Cabinet and its secretary are vested with the power and authority to enforce the Commonwealth's surface mining and reclamation laws**, which would necessarily include investigating potential mining permit violations and making the initial determination of whether a violation exists. *See White v. Shepherd*, 940 S.W.2d 909, 911, 44 4 Ky. L. Summary 9 (Ky. App. 1997). Courts, on the other hand, are vested in such proceedings only with the authority to review final orders from the Cabinet on appeal. *Id.*

> To put it simply, if a permit violation is to be the basis for a default under the lease, it is axiomatic that there must first be a determination, by the entity authorized to make it, that a permit violation exists. Here, the record is devoid of any determination from the Cabinet that Martin Marietta violated any provision of its mining permit. ***In the absence of a Final Order to that effect from the Cabinet, the circuit court would have no authority to make such a determination on its own.***

*Vander Boegh*, 394 S.W.3d at 930-31(emphasis added).

Applying the above standard, the plaintiffs must show a Final Order by the Cabinet has been issued to establish negligence *per se* under the mining regulations they cite. Each regulation purportedly violated is analyzed below to determine whether the plaintiffs have the proof they need to succeed on their motion for partial summary judgment.

### a. 405 KAR § 16:020 (Contemporaneous Reclamation)

This regulation addresses, in relevant part, the Commonwealth's requirements for cleaning sediment ponds. Specifically, Section 6(3)(b)(3) requires that:

> [a]ll diversion ditches, sedimentation ponds, haul road drainage ditches and culverts, shall be rehabilitated as necessary and continually maintained to comply with the applicable performance standards and with the designs approved in the permit. Sediment shall be removed from the sedimentation ponds if the design sediment storage volume has filled with sediment.

The plaintiffs argue Pine Branch fell "woefully short" of this regulation, as evidenced by "numerous Non-Compliance Notices", as well as testimony from Inspector Daniel Wilson

from the Cabinet and Pine Branch employee Don Gibson.  [Record No. 139]  Wilson's deposition indicates that there were "a couple of ponds" cited for improperly maintaining sediment after the flooding event.  *Id*.  Additional mine inspection reports indicated that "a number of ponds under the control of [Pine Branch] had accumulated remarkable sediment buildup prior to the flood."  *Id*.  This sediment buildup and other debris in the ponds purportedly rendered them less effective to restrict outward water flows.

Based on the record, however, it does not appear the ponds reached the requisite "clean-out" level prior to the flooding event.  Although Pine Branch did receive a Notice of Non-compliance for the erosion of downstream sides of certain sediment ponds, the erosion the Cabinet sought to remedy was caused by the flooding event rather than apparent maintenance deficiencies.  Importantly, the Cabinet did not issue a Final Order concluding the Pine Branch violated this administrative regulation.

### b.  405 KAR §§ 16:090 (Sedimentation Ponds) and 16:070 (Effluent Limitations)

The plaintiffs next allege that Pine Branch's sediment ponds failed to meet the standards outlining the required volume of runoff storage.  They claim that Pine Branch's ponds "logically must have retained virtually no runoff at all during the rain event."  [Record No. 139]  Additionally, they argue that the state of the ponds during the flooding event failed to sufficiently retain runoff water, which allowed it to overflow from the ponds and onto residential areas.  In support of this theory, they contend that "fish originating from the silt ponds were displaced all the way to the plaintiffs' properties."  *Id*.  In their view, the flow of fish and other debris "from the mine site [that] flowed into the residential areas downslope illuminates the fact that the [ponds] did not mitigate the flow or properly retain sediment" in

contravention of a related administrative regulation designed to prevent debris from flowing into non-permitted areas.  *Id*; *see* 405 KAR § 16:070.

But the plaintiffs failure to offer any proof of these violations, much less a Final Order concluding that violations occurred.  Conversely, Pine Branch's expert hydrologist, Dr. Michael Ricci, concluded that the pond design met the administrative standard after conducting modeling that found the ponds would not have "overtopped" during the flooding event.  But without affirmative evidence suggesting that the silt and other debris found downstream in the damaged areas originated in Pine Branch's permitted sediment ponds, the Court is in no position to substitute its judgment for that of the Cabinet in determining whether violations pursuant to these regulations occurred.

### c.  405 KAR §§ 16:200 (Revegetation)

The plaintiffs also contend that Pine Branch was negligent in meeting its revegetation and reclamation requirements.  As they note, a landscape is altered after surface mining strips away the natural soil and vegetation.  Kentucky regulations require surface miners to meet certain standards for reclaiming the natural elements of the landscape to control rainwater flows.  Specifically, Section 16:200 requires miners to pursue revegetation of the disturbed area "in a manner that encourages prompt vegetative cover."  This process allows for "soil stabilization, self-regeneration, and plant succession" to bond the soil and reduce runoff.  *Id*.

As evidence a violation of this regulation occurred, the plaintiffs point to the Cabinet inspector's deposition in which he asserts that restoring 90 percent of vegetation is required to complete the revegetation process in a particular area.  [Record No. 139, p. 10] But the inspector testified that Pine Branch had not achieved anywhere near this level just a week prior to the flooding event by comparing the "estimated acres disturbed" with the "acres bonded,"

even though the latter could include ground that has not been disturbed.[9]  This figure would indicate that only ten percent of the site mined by Pine Branch had been reclaimed.  And as the mine's Director of Permitting and Regulatory Affairs stated in his own deposition, roughly a fifth of the topography had been entirely restored at this point, even though it is disputed whether this figure accounts for the permitted area in full or merely the amount of land subject to a specific Agreed Order with the Cabinet.[10]

On the other hand, Pine Branch contends that the proper calculation would be to compare the "estimated acres disturbed" with "estimated acres reclaimed," which would suggest that nearly three-quarters of the mined landscaped had been reclaimed at the time of the flooding.

---

[9]      The Mine Inspection Reports confirm that Pine Branch had commenced the reclamation process.  They document mine acres authorized by a particular permit ("Acres Permitted"), acres subject to a bond ("Acres Bonded"), and the estimated acres that have disturbed by mining ("Est. Acres Disturbed").  Here, "disturbed" meant the "ground has been broken" even though those acres "could have been reclaimed" already or "could still be active" for mining operations.  The Report for Permit No. 897-0568 dated July 21, 2022, which was a week before the flood event, indicates that "Est. Acres Disturbed" on that permit were 2,000 with approximately 1,600 "Est. Acres Reclaimed."  Similarly, a July 18, 2022, mine inspection report for Permit No. 897- 0569 indicates that there were 1,200 "Est. Acres Disturbed" and 725 "Est. Acres Reclaimed."  In other words, these reports indicate that an estimated 2,325 of 3,200 disturbed acres, or 73 percent, had been reclaimed.

A precise, factual determination of reclaimed acres is largely unnecessary here given the posture of the case.  Instead, the material question is whether a Final Order was issued by the appropriate authorities documenting a violation of the regulation.

[10]      Additionally, the plaintiffs attempt to demonstrate that revegetation had not sufficiently occurred following surface mining activities on the land by referencing an aerial photograph showing the land as "barren."  However, Pine Branch claims that the photograph used as an exhibit in the deposition of its Director of Permitting and Regulatory Affairs is "from eight years before the flood event."  [Record No. 141]

Regardless of which calculation is proper, does any shortcoming below the administrative standard mean a violation occurred?  The Cabinet's inspector declined to render such an assessment.  The inspector responded "no" when asked if a finding that the disturbed land fell below the mandated ninety percent revegetation threshold necessarily meant that a permittee was in violation of the standard.  [Record No. 142, p. 22]  Kentucky mining laws and regulations seemingly confirm the same.  *See* 405 KAR 10:040 Section 2(4)(b)(1); 405 KAR 16:200 Section 5(2)(a).

In fact, Pine Branch's shortcomings below the administrative reclamation standard has been accommodated by the Cabinet through deferments.  The Cabinet may allow a permittee to defer the time criteria for coal removal and contemporaneous reclamation requirements on specified areas if the permittee demonstrate that deferment is necessary to address one or more of the following:

(a) Adverse condition including weather, labor, or other conditions clearly beyond the permittee's control;

(b) Combined surface and underground mining activities subject to the provisions of 405 KAR 8:050, Section 7, and 405 KAR 20:020; or

(c) Coal marketing problems.

405 KAR § 16:020.

The plaintiffs argue that from December 2019 through the flooding event in July 2022, Pine Branch repeatedly sought deferments without sufficient justification.  But multiple lawful deferments do not constitute a Final Order documenting a violation as contemplated and required by Kentucky law.  Regardless of the reasoning for, or the validity of, multiple extensions, the Court declines the invitation to substitute its judgment for that of the Cabinet.

- 12 -

Without a Final Order documenting a violation pursuant to this regulation, the plaintiff cannot prevail on a theory of negligence *per se* regarding this issue.

### d.  405 KAR § 16:060 (General Hydrologic Requirements)

The plaintiffs next point to the administrative regulation for maintaining steep slopes, including highwalls.  In their view, Pine Branch's failure to prevent debris and waste from flowing downstream during the flooding event after passing over a poorly reclaimed highwall constitute negligence *per se*.  They argue that the "complete lack of any anchoring vegetation meant that any materials that flowed from above [Pine Branch's] highwall or overflowed from the [silt] ponds flowed unabated downslope into non-permitted areas."  [Record No. 139]

Pine Branch concedes that the Cabinet formerly assessed two Notices of Non-compliance regarding its reclamation of a highwall.  But there has been no evidence presented to demonstrate that the Notices ever became Final Orders.  Notably, the defendant received an extension to reclaim a highwall pursuant to 405 KAR § 12.020.  According to this regulation, the Cabinet could not have granted the extension lawfully if the "failure to meet the time previously set was not caused by lack of diligence on the part of the [entity] to whom the notice of noncompliance and order for remedial measures was issued."[11]  The Court must accept that the Cabinet followed its own guidance.

The plaintiffs further argue that Pine Branch placed "spoil, waste, debris, and abandoned or disabled equipment" on certain steep slopes that flowed downstream during the flooding into the non-permitted, residential areas.  But the plaintiffs fail to provide any proof

---

[11]     According to Pine Branch, the "Cabinet agreed to an extension until July 2024 for reclamation of the highwall and there is no indication that Pine Branch was not in compliance with that timeline."  [Record No. 141]

- 13 -

that the material originated on Pine Branch's site.  One thing, however, is clear: the Cabinet has not issued a Final Order documenting a violation of this regulation.

**Kentucky Energy and Environment Cabinet**

Aside from the theory that Pine Branch violated multiple mining regulations, the plaintiffs expend significant energy asserting that the Cabinet has negligently enforced surface mining regulations.  Not only do they claim that the Cabinet has failed to enforce its own regulations with the veracity required to protect the public from the excesses and inherent hazards of mining operations, they also complain that the agency could be comparatively liable for its complicit role in greenlighting Pine Branch's conduct that they claim caused the damage.  For example, the plaintiffs flatly assert that "[n]o real enforcement occurred" and argue "it is clear that the Cabinet had no real interest in enforcing the rigors of [mining regulations]."  [Record No. 149]  And they go so far as to argue that "no [Notices of Non-Compliance] would ever have been issued regardless of the severity of violations present."  *Id*. Thus, rather than plead a cause of action against the Cabinet, they suggest that the Cabinet's purportedly lax enforcement against Pine Branch indicates the agency is captured by the industry it is supposed to regulate.

While decent portions of the plaintiffs' briefs are devoted to questioning the diligence of the Cabinet, the plaintiffs seemingly focus on the agency's willingness to grant Pine Branch extensions for fully reclaiming slopes and a highwall as 405 KAR § 16:060 requires.  They argue that "these extensions were granted every single time without any additional oversight or scrutiny."  *Id*.  The parties agree that the latest extension included a bond of $505,000.00 and an extended compliance deadline of two years.  While the Cabinet may have been lenient

- 14 -

with Pine Branch regarding its completion of remedial responsibilities, the absence of aggressive enforcement does not establish nefariousness or liability.

Courts call balls and strikes as they are presented.  Commentary outside the lines established by the four corners of a case would be improper.  However, to the extent the plaintiffs contend that the Cabinet has violated the law, they have not presented evidence to that effect.  Their central argument is seemingly that the Cabinet must be administratively negligent because it has not found Pine Branch in violation of mining regulations to date despite purportedly "clear" conduct that amounts to such.  But the Court observes only that unsubstantiated accusations, speculation, and conjecture does not establish negligence *per se* under Kentucky law.

## C. Causation

Even if the plaintiffs had demonstrated that Pine Branch violated a common law or statutory duty of care, the would still be required to produce some evidence that the company's violation was a substantial factor in causing the damages they experienced to prove liability. *See James v. Meow Media, Inc.*, 300 F.3d 683, 689 (6th Cir. 2002*); Mullins v. Commonwealth Life Ins.*, 839 S.W.2d 245, 247 (Ky. 1992).  As discussed previously, a party asserting negligence on the part of another must prove legal causation connecting the breach and the injury.  *See Steelvest, Inc. v. Scansteel Service Center*, 807 S.W.2d 476 (Ky. 1991).  Pine Branch alleges that it is entitled to summary judgment because the plaintiffs cannot prove their asserted negligence claims without evidence that the mine at Combs Branch caused the damage sustained during the historic flooding event.  In response, the plaintiffs argue that they can nonetheless prove causation despite the exclusion of its sole expert witness.

- 15 -

In cases involving manmade land disturbances, a party seeking to show another caused or otherwise negligently contributed to the disturbance is well-served by providing evidence comparing conditions before and after the event. *See, e.g., St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1363 (Fed. Cir. 2018). This is especially true when multiple elements like soil and water interact to transform the topographical character of a particular place during an event that caused property damage. As emphasized in the *Hydrologic Modeling Benchbook*, soil and water movements in areas like the River Caney Watershed with "natural hydrologic systems are inherently complex." [12]   Determining the causation of events involving these systems "can rarely be described in simple terms, nor can their behavior be predicted with anything less than a computer-based hydrologic simulation model." Of course, modeling is not a prerequisite for establishing that a company's actions caused damage, but in many courts "[c]omputer-based hydrologic models have proven helpful, in fact essential, in a variety of water disputes" like the present one. *Id*.

When causes of action as asserted in this case depend entirely on whether silt ponds were properly managed and nearby slopes used for surface mining had been sufficiently reclaimed at a point in time, expert testimony is particularly useful for distilling the complexities of causation. This need is compounded when a cotemporaneous event—namely, historic flooding—could be separately, and perhaps proximately, causal. Kentucky has long held that expert testimony is necessary for "a proper understanding of that which requires scientific or specialized knowledge and which cannot be determined intelligently from

---

[12]     THE NATIONAL JUDICIAL COLLEGE, HYDROLOGIC MODELING BENCHBOOK, DIVIDING THE WATERS (2010), available at https://www.judges.org/wpcontent/uploads/2020/03/DTW-Hydrologic-ModelingBenchbook.pdf.

testimony on the basis of ordinary knowledge gained in the ordinary affairs of life." *Commonwealth, Dep't of Highways v. Robbins*, 421 S.W.2d 820, 824 (Ky. 1967) (citing *Louisville & N.R. Co. v. Conn*, 200 S.W. 952 (Ky. 1918)). Confirming this principle in cases involving flooding damage, the Sixth Circuit has endorsed the view that "causation of flooding is a complex issue which must be addressed by experts." *Cox v. Tennessee Valley Auth.*, 989 F.2d 499, 1993 WL 72488, at *11 (6th Cir. Mar. 15, 1993).

The sole expert witness the plaintiffs identified in support of their case was D. Scott Simonton, a registered professional engineer with experience in environmental and public health protection. Simonton intended to offer testimony that supported the plaintiffs' theory of Pine Branch's negligence after concluding that mining had occurred in the River Caney Watershed where Pine Branch operated the permitted mines, erosion had occurred in the watershed, and the surface area of a nearby sediment pond had experienced a reduction before the flooding event.

In the materials the plaintiffs disclosed, Simonton cited studies he conducted using hydrologic modeling in areas outside of this particular watershed with results that he claimed were extrapolatable. But unlike the materials disclosed in this case, those studies relied upon site-specific hydrologic modeling.[13] As the Court previously highlighted, Simonton admitted at the time that he had "never seen [an opinion] where modeling wasn't included" before

---

[13]       These studies alone are not the only sources of information from which Simonton drew his opinions. His report cited first-hand aerial observations of the Caney Creek flooding in the weeks after the event, as well reviews of relevant precipitation data and examinations of Google Earth imaging over an extended period. But without testing or modeling based specifically on the mining sites that purportedly led to the devastation, Simonton's report fell victim to the kind of "anecdotal evidence" and "improper extrapolation" that warranted exclusion.

- 17 -

adding that modeling "is kind of the standard." [Record No. 116] Separately, Simonton opined in a case related to floodplain changes that "models must be developed" which suggested that accurately measuring the impact of a surface disturbance on water flows typically involves hydrologic modeling to enhance reliability. *Id.* No site-specific modeling, however, was ever conducted by Simonton regarding Pine Branch's activities in the River Caney Watershed. The plaintiffs did not disclose any additional material aside from Simonton's report titled "summary of *initial preliminary opinions*" authored more than six months before the expert disclosure deadline. Thus, the Court excluded Simonton's testimony on this critical issue.[14]

The defendant is in a different position, having retained professional engineer Dr. Michael Ricci as an expert witness. In accordance with the standard for cases involving hydrologic changes, Ricci conducted HEC-HMS and HEC-RAS modeling for the River Caney Watershed. His results demonstrate that Pine Branch's mining operations decreased peak flow into the watershed, as well as the flood surface area, compared to pre-mining conditions. Ultimately, these results demonstrate that the mining activities *did not cause or exacerbate* the property damage experienced by the plaintiffs during the flooding.

---

[14]     The Preliminary Scheduling Order [Record No. 15] in this matter directed the parties to complete all written discovery by March 6, 2023. Presumably in compliance with this preliminary deadline, plaintiffs identified Simonton and provided his report to Pine Branch. [Record No. 33] However, the Court subsequently entered a Scheduling Order, requiring that the plaintiffs disclose the identity of expert witnesses who may be used at trial and any written reports by the expert witnesses as required by Rule 26(a)(2) by November 21, 2023. [Record No. 69] The plaintiffs did not supplement their disclosure of expert witness material during this intervening period. When the deadline passed, the plaintiffs had only submitted the report containing Simonton's "initial preliminary opinions," which ran afoul of the rules governing the admission of expert witness testimony. *See* Fed. R. Civ. P. 26(a) (requiring that a party has an obligation to disclose "a complete statement of all opinions the witness will express."); Fed. R. Evid. 702.

As this case proceeds toward trial, the plaintiffs lack expert witness testimony to demonstrate that Pine Branch's allegedly negligent operation of its mine caused the damage they experienced during the flooding event.  They lack expert testimony regarding: soil movement in the watershed before and after the flooding; how the hydrologic systems impacted the landscape amid excessive rainfall; and whether sediment from the silt ponds and other debris emanated on Pine Branch's mine because of negligent pre-flooding operations.

The remaining evidence the plaintiffs *can offer* to prove causation at trial is thin. Without documented violations of Kentucky mining regulations or an expert to explain sophisticated hydrologic processes amid a cotemporaneous event to a prospective jury comprised of laypeople, the plaintiffs broadly point to the following: (1) they can argue that the Cabinet issued two Notices of Non-Compliance, which are tantamount to warnings, regarding highwall reclamation prior to the flooding; (2) they can attempt to tie the sediment and the goldfish that ended up on their properties during the flooding to silt ponds on Pine Branch's property; and (3) they can utilize the plaintiffs' lay testimony.[15]  In short, the plaintiffs' remaining causation evidence is largely speculative, circumstantial, and unscientific.

The undersigned is aware of at least one comparable case in this district where a non-moving party faced a motion for summary judgment because they lacked an expert witness to prove causation.  In *Barnett v. Grizzly Processing, LLC*, the plaintiffs "failed to offer expert evidence linking the dust particles on [their] respective properties to the [d]efendants' plant"

---

[15]     Plaintiff Monica Fugate provided deposition testimony to the effect that much of the property damage occurred before most of the rainfall.  However, her testimony does not include measurements or credible inferences that the damage to her property would not have occurred had Pine Branch not mined in the watershed.

necessary for proving trespass and nuisance where causation is an essential element in each cause of action.  809 F. Supp. 2d 636, 642 (E.D. Ky. 2011).  With the plaintiffs unable to offer expert testimony to satisfy this element, the defendants raised alternative possible sources of the dust particles that invaded the plaintiffs' properties.  The judge concluded, however, that "it is what is missing from this evidence that matters: the [d]efendants have not shown that any of these sources actually emitted dust particles that could have invaded the [p]laintiffs' properties" before denying the motion.  *Id.* at 644.  Here, the difference is that the Court need not speculate regarding a plausible alternative cause of the water, sediment, and debris damage. It is undisputed that rapidly rising flood waters flowed into the River Caney Watershed and onto the plaintiffs' properties during an episode of historic flooding.

Put simply, without any expert witness testimony to support the sophisticated hydrological theory of causation between Pine Branch's upstream mining activities and the damage the plaintiffs experienced during the cotemporaneous flooding event, they cannot prove the essential element required to succeed on their negligence claim under Kentucky law. *See, e.g., Gregory v. Burnett*, 577 F. App'x 512, 520 (6th Cir. 2014); *Snowden v. Speedway LLC*, 2021 WL 5625548, at *17 (E.D. Ky. Nov. 30, 2021) (concluding summary judgment is appropriate when a plaintiff fails to produce expert testimony on an issue that requires expert proof).  Given the inherent complexity of proving that element in this case, the lack of expert testimony to support the plaintiffs' theory renders judgment for the defendant proper as a matter of law.  Pine Branch's cross motion for summary judgment will be granted.

### IV.   Conclusion

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.     The plaintiffs' motion for partial summary judgment [Record No. 139] is

**DENIED**.

2.     Defendant Pine Branch Mining, LLC's cross motion for summary judgment

[Record No. 142] is **GRANTED**.

3.     This action is **DISMISSED**, with prejudice, and **STRICKEN** from the docket.

Dated: May 14, 2024.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky

- 21 -